# United States Court of Appeals

## For the First Circuit

No. 03-1895

LONG TERM CARE PHARMACY ALLIANCE,

Plaintiff, Appellee,

v.

CHRISTINE FERGUSON, DIRECTOR,
COMMONWEALTH OF MASSACHUSETTS
DIVISION OF HEALTH CARE FINANCE AND POLICY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

Romeo G. Camba, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, and William Porter, Assistant Attorney General, were on brief for appellant.
David J. Farber with whom John Rosans, Patton Boggs LLP, Mark E. Robinson, Daniel S. Savrin, Melissa G. Liazos and Bingham McCutchen LLP were on brief for appellee.

March 17, 2004

**BOUDIN, <u>Chief Judge</u>**.  This is an appeal from a preliminary injunction entered by the district court.  That court enjoined the Commonwealth of Massachusetts from implementing an emergency regulation reducing the rates that the state pays under the state's Medicaid program to pharmacies to reimburse them for prescription drugs furnished for the use of Medicaid patients.  The background events are as follows.

Medicaid is a federal-state program to assist the poor, elderly, and disabled in obtaining medical care.  42 C.F.R. § 430.0 (2002).  Under the Medicaid Act, which is Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (2000), the federal government provides financial support to states that establish and administer state Medicaid programs in accordance with  federal law through a state plan approved by the U.S. Department of Health and Human Services ("HHS").  42 U.S.C. § 1396 (2000); 42 C.F.R. §§ 430.0, 430.10-.20 (2002).  One requirement is that the state have a scheme for reimbursing health care providers.  42 U.S.C. §§ 1396a(a), 1396d(a) (2000).

Massachusetts participates in Medicaid and its plan, known as "MassHealth," is administered by an entity ("the Division") based in the state's Executive Office of Health and Human Services ("the Executive Office").  Mass. Gen. Laws. ch. 118E, §§ 1, 7, 8, 9, 9A, 11 (2002).  The Division fixes the rates it will pay to reimburse providers for numerous health services.

These include the furnishing by pharmacies of prescription drugs for Medicaid patients.  114.3 C.M.R. §§ 6.00-49.00 (2003).

This reimbursement is calculated separately for the cost of the drug to the pharmacy and for the cost of dispensing it. 114.3 C.M.R. §§ 31.02, 31.04, 31.07 (2003).  The former, with which this case alone is concerned, is governed by federal, 42 C.F.R. §§ 447.331, 447.332 (2002), and state formulas of some complexity, 114.3 C.M.R. § 31.04 (2003); but the only method at issue here calls for reimbursement for the pharmacy's "estimated acquisition cost."  Massachusetts defines this cost as an estimate of the price "generally and currently paid by eligible pharmacy providers" for the most common package size.  Id. § 31.02.

This general and current price is calculated as a percentage of a so-called "wholesaler's acquisition cost" ("WAC") for each drug in question.  Although how the WAC numbers are derived is not fully explained by the parties, the Commonwealth says that it is effectively the wholesale catalogue price for the drug but that the real price may often be a few percentage points lower for non-generic drugs (and many points lower for generics) because of common discounts (e.g., for speedy payment).[1]  Whether

_____

[1]An August 2001 report by HHS' Office of the Inspector General, based on data from 8 states (not including Massachusetts), relied on by the Division in its initial rate setting, also concluded that actual acquisition costs were on average below WAC, although these numbers apparently did not include hospital and nursing facility service pharmacies. Office of the Inspector Gen., Dep't of Health & Human Servs., Medicaid Pharmacy--Actual

-3-

there may be other pertinent costs not included in WAC, and how profits are provided, is less clear.

In 2002 a new HHS report suggested that a number of states were overpaying for drugs. Office of the Inspector Gen., Dep't of Health & Human Servs., <u>Medicaid Pharmacy--Actual Acquisition Cost of Generic Prescription Drug Products</u> (2002). Massachusetts was then using a WAC plus 10% formula to reimburse pharmacies. The state legislature for fiscal year 2003 ordered a reduction, directing the Division to determine whether WAC minus 2% would suffice to ensure enough participating pharmacies to supply patient needs. The Division held hearings in September 2002 and sought data from Massachusetts pharmacies as to their costs of acquisition of individual drugs. The pharmacies generally refused to provide the data, claiming that such data was proprietary.

At the hearings, chain pharmacies such as Brooks and CVS conceded that they usually obtained branded drugs at WAC minus 2% for prompt payment (and paid even less for generics), but the three largest chains said they would no longer serve MassHealth if payment were reduced to WAC minus 2%. They claimed <u>inter</u> <u>alia</u> that MassHealth prescriptions involved extra work and that certain costs like overhead and storage were not included in the WAC figures. In sum, they said that they would lose money if they continued at the proposed reduced rate.

--------

<u>Acquisition Cost of Brand Name Prescription Drugs</u> (2001).

In a report issued in October 2002, the Division concluded that the pharmacies acquired the branded drugs at WAC and generics at less and that while other costs were incurred the Massachusetts pharmacies had not documented them. Div. of Health & Human Servs., Commonwealth of Massachusetts, Report to the General Court Reimbursment for Prescribed Drugs 15 (2002). The recommendation was to reduce payments to WAC plus 6% partly to cover other (unquantified) costs and partly to "ensure that MassHealth members will have sufficient access to prescribed drugs." Id. This new WAC plus 6% rate was implemented immediately and is not at issue in this case.

On March 14, 2003, the Division adopted emergency amendments to its regulations, lowering the rate to WAC plus 5% effective April 1, 2003. According to the Division, only one pharmacy had dropped out of MassHealth under the WAC plus 6% rate, persuading the Division that a small further reduction would save money and not curtail supply. The notice adopting the new change, and other changes not here involved, proposed a public hearing in May 2003 but made clear that the Division believed it was entitled to implement the new WAC plus 5% rate in advance of any hearing.

To challenge that contention and the proposed lower rate, the Long Term Care Pharmacy Alliance ("Long Term") brought the present action in the district court. Long Term represents a set of "closed" pharmacies that provide drugs not to the general public

but only to nursing home and other institutional patients. Seeking a preliminary injunction, Long Term claimed that the Division's failure to provide a prior hearing violated one provision of the Medicaid Act and its 1% reduction within five months and without new evidence or findings violated another provision of the statute. The respective statutory provisions are 42 U.S.C. § 1396a(a)(13)(A) (2000) and 42 U.S.C. § 1396a(a)(30)(A) (2000).

In a nutshell, the first of these Medicaid Act provisions--which we will call subsection (13)(A)--requires <u>inter alia</u> that a "public process" be used to set "rates of payment . . . for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded," in which "providers," among others, can comment on "proposed" rates. The second provision, subsection (30)(A), in substance requires <u>inter alia</u> that rates for services in general be "sufficient to enlist enough providers to provide services similar to those generally available in the area."[2]

The district court granted the preliminary injunction on April 1, 2003. <u>Long Term Care Pharmacy Alliance</u> v. <u>Ferguson</u>, 260 F. Supp. 2d 282 (D. Mass. 2003). It directed that the reduced WAC plus 5% rate not be applied to prescription drugs supplied to MassHealth nursing home patients until after notice and comment

---

[2]Under federal regulations, more specific findings that rates are adequate are required for services covered by subsection (13)(A). 42 C.F.R. § 447.253 (2002).

rulemaking under subsection (13)(A) and not be applied to such drugs provided to any MassHealth patient until, following the rulemaking, the Commonwealth made findings satisfying the subsection (30)(A) requirements. Id. at 295. The Commonwealth appealed from this preliminary injunction which remains in effect today.

Because the Division gave notice of the new rates shortly before adoption and thereafter held public hearings, the question arises whether this case is moot. Neither party argues for mootness, but in a footnote the Commonwealth anticipates a mootness objection and argues against it. If the controversy were now academic, this would hazard our Article III jurisdiction, Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003), requiring us to dismiss sua sponte, Allende v. Shultz, 845 F.3d 1111, 1115 n.7 (1st Cir. 1988), unless the case fell within the exception for issues that are "capable of repetition, yet evading review." S. Pac. Terminal Co. v. ICC, 219 U.S. 498, 515 (1911).

The case is not moot. Although notice and opportunity for comment have both now been provided, the Division has not adopted a final (non-emergency) version of the rate based on the finding under subsection (30)(A) deemed by the district court to be required. Possibly, the Division has withheld a post-hearing order and made no finding precisely because it wants to vindicate its authority for use in the future. Still, the injunction currently

precludes the Division from implementing the reduced WAC plus 5%
rate; and it does so based on an alleged violation of subsection
(30)(A) not yet cured.  And, if subsection (13)(A) applied, even
more specific findings would also be required by regulations
pertaining to services covered by that section.  See note 2, above.
The "controversy" is therefore not moot and we need not consider
whether the recurring issues exception would otherwise apply.

Turning then to the district court's decision to issue
the injunction, there is no reason to repeat the familiar four-part
test for preliminary injunctions, New Comm Wireless Servs., Inc. v.
SprintCom, Inc., 287 F.3d 1, 8-9 (1st. Cir. 2002), or parse the
various standards of review that may be implicated.  Water Keeper
Alliance v. U.S. Dept. of Defense, 271 F.3d 21, 30 (1st Cir. 2001).
In this case, the only issues that need be decided to resolve the
controversy are issues of law subject to plenary review.  Id.

We begin with subsection (13)(A) which was the basis for
the first part of the district court's injunction and requires, in
relevant part, that a state plan provide:

> (A) for a public process for determination of
> rates of payment under the plan for hospital
> services, nursing facility services, and
> services of intermediate care facilities for
> the mentally retarded under which—
>
> (i) proposed rates, the methodologies
> underlying the establishment of such rates,
> and justifications for the proposed rates are
> published,

-8-

(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,

(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published . . . .

42 U.S.C. § 1396a(a)(13)(A) (2000).

Broadly speaking, subsection (13)(A) requires something on the order of notice and comment rulemaking for states in their setting of rates for reimbursement of "hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded" provided under the Medicaid Act. Am. Soc. of Consultant Pharmacists v. Concannon, 214 F. Supp. 2d 23, 28-29 (D. Me. 2002); accord Children's Seashore House v. Waldman, 197 F.3d 654, 659 (3d Cir. 1999), cert. denied, 530 U.S. 1275 (2000). The Commonwealth assumes that if Long Term's members are providing "nursing facility services," such members (represented by Long Term) are entitled to sue as "providers" in federal court to enjoin violations of subsection (13)(A) that affect their interest.

It is quite possible that under emergency conditions subsection (13)(A) may not automatically require notice and comment before a new rate goes into effect.[3] But the Commonwealth has not

_____

[3]Cf. 5 U.S.C. § 553(b)(B) (2000) (APA exception to requirement of notice and comment for "good cause" including when it would be "impracticable"); Utility Solid Waste Activities Group v. EPA, 236 F.3d 749, 754-55 (D.C. Cir. 2001) (impracticable "when an agency

argued on appeal that exceptional circumstances excused a procedural requirement that would otherwise apply. And the findings required by the regulation would remain an obstacle. Instead, the Commonwealth's main response is that Long Term's members simply do not provide services encompassed by subsection (13)(A) and so the notice and comment provisions have no application to rates set for reimbursing its members.

In the abstract, this is not a surprising position. The Commonwealth, through its reimbursement program, buys prescription drugs for MassHealth patients. In the absence of a statute, nothing whatever would require the state to provide notice and comment, or any other kind of process, before deciding how much it was willing to pay for any or all drugs. Retail pharmacies that supply MassHealth customers directly are subject to the same WAC plus something rate and have no protection under subsection (13)(A) (or under the first prong of the district court's injunction). See Am. Soc. of Consultant Pharmacists, 214 F. Supp. 2d at 31.

However, subsection (13)(A) does provide notice and comment rights as to rates set for "nursing facility services"; and Long Term's members seek to bring themselves within this statutory umbrella. They say also that their own operations are different

finds that due and timely execution of its functions would be impeded by the notice otherwise required")(quoting U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 30-31 (1947)).

from, and more expensive than, those of retail pharmacies supplying MassHealth patients who walk into drug stores--because of the extra packaging and tracking needed for residents of nursing homes. Apparently nursing homes use the specialized closed pharmacies precisely to do these tasks on a cost-efficient basis.

The statutory coverage issue is not straightforward. The critical phrase in the statute is "nursing facility services" which is in turn defined to mean

> services which are or were required to be given an individual who needs or needed on a daily basis nursing care (provided directly by or requiring the supervision of nursing personnel) or other rehabilitation services which as a practical matter can only be provided in a nursing facility on an inpatient basis.

42 U.S.C. § 1396d(f) (2000). This language gives some aid to the Commonwealth because drugs are certainly not provided "only" in nursing facilities on an inpatient basis. On the other hand, drugs are somewhat closer to the core function of nursing home operations than, say, the provision of a gift shop or fresh flowers in the rooms.

The district court points to another section of the statute obligating nursing facilities to provide "nursing and related services" of a high order, medically related social services, and "pharmaceutical services," 42 U.S.C. § 1396r(b)(4)(A) (2000); but this language is inconclusive. It says that providing drugs is essential in a nursing home, something we already know; so

-11-

presumably the nursing home would be reimbursed for drugs it supplied itself and could insist on reimbursement rates that were adopted under subsection (13)(A) after notice and an opportunity to comment.

Yet it cannot be enough to trigger subsection (13)(A) that Long Term's members happen to be doing something (providing drugs) for which reimbursement rates would require notice and comment rulemaking if done directly by the nursing home. Here the supplier claiming reimbursement is not the nursing home but the closed pharmacies. As we have noted, retail pharmacies that provide prescription drugs for Medicaid patients who walk into drugstores are not covered by subsection (13)(A). The "who" provides may be as important to subsection (13)(A) as the "what."

Language being less than plain, we ordinarily would look to purpose and legislative history, Stoutt v. Banco Popular de Puerto Rico, 320 F.3d 26, 31 (1st Cir. 2003), but we have been furnished with nothing that is helpful. Indeed, Congress may not have had a specific intention as to nursing homes and closed pharmacies: it could have thought that embattled care facilities like hospitals and nursing homes needed special protection from arbitrary rates but that ordinary pharmacies did not and never considered the problem of a care facility outsourcing a small part of its customary function, with claims under subsection (13)(A) being made not by the facility but by the third-party provider.

On balance, the more straightforward reading of "nursing home services" encompasses services provided <u>by</u> the nursing home and not services provided <u>to</u> the nursing home or its patients by third-party independent suppliers like closed pharmacies. As a matter of crude analogy, the closed pharmacies look more like suppliers to the nursing home than providers of nursing home services; and, whatever extra benefits they provide, Long Term's members, in supplying the raw drugs to the nursing homes, look a lot like retail drug stores supplying MassHealth patients. Statutory language, without a rationale for the result, is rarely conclusive but it is a start.

Turning to imputed purpose, it is easy to imagine why Congress wanted special protection for care facilities. Their sunk-cost structure makes them especially vulnerable to slow destruction by long-term underfunding; by contrast, the market reaction is likely to be quick and decisive if the Commonwealth seeks to underpay for drugs, whether provided by ordinary retailers or closed pharmacies. If WAC plus 5% is not enough to elicit an adequate supply, the Division will simply be forced to pay more and promptly so. Thus, whether or not Congress even thought specifically about closed pharmacies, the likely purpose for its broader distinction suggests a rationale that leaves closed pharmacies on the unprotected side of the line and outside subsection (13)(A). We so hold.

-13-

This brings us to subsection (30)(A) which presents an interpretive problem of quite a different kind. Whereas subsection (13)(A) has a narrow subject (rates for three specified sets of services) and confers procedural rights on designated persons or entities (including "providers"), subsection (30)(A) has much broader coverage, sets forth general objectives, and mentions no category of entity or person specially protected. The state plan, says subsection (30)(A), must

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A) (2000).

This subsection, unlike subsection (13)(A), is not confined to particular services. Although the statute does not provide any procedure for the determination of such "methods and procedures," implementing regulations for the subsection require public notice of any "significant proposed change" in the "methods and standards for setting payment rates for services," and also opportunity for comment, 42 C.F.R. § 447.205 (2002)(although not

-14-

necessarily in advance, see 46 Fed. Reg. 58,677, 58,678 (Dec. 3, 1981)). The statute also includes a set of substance goals for the "methods and procedures" including the enlistment of enough providers to furnish service generally available in the community. 42 U.S.C. § 1396a(a)(30)(A) (2000).

The Commonwealth's broadest response is that the pharmacies have no right to sue to enforce subsection (30)(A) or its implementing regulations. Of course, the Secretary of HHS ("the Secretary") can enforce compliance with the provision and implementing regulations already mentioned, in a number of ways--by disapproving a state plan, 42 C.F.R. § 430.15 (2002), and by cutting off funds, 42 U.S.C. § 1396c (2000); 42 C.F.R. § 430.35 (2002). By contrast, nothing in subsection (30)(A) expressly provides that those who furnish Medicaid services have any enforcement rights or, indeed, have any specific rights to procedural (e.g., notice and comment) or substantive (e.g., just and reasonable rates) protections.

Private rights of action were once freely inferred from federal statutes that regulated conduct--and here subsection (30)(A) certainly regulates the plan provider--but the ready inference in favor of private enforcement no longer applies. Compare J.I. Case Co. v. Borak, 377 U.S. 426 (1964), with Cort v. Ash, 422 U.S. 66 (1975), with Alexander v. Sandoval, 532 U.S. 275 (2001). In the past, Long Term's best argument would have been to rely upon

-15-

section 1983 as providing an explicit automatic private right of action for injunctive relief wherever federal law regulates conduct by a state entity:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2000).

However, the Supreme Court recently closed that door as well in Gonzaga University v. Doe, 536 U.S. 273, 283 (2002). There, the Supreme Court assimilated its earlier cases restricting implied rights of action in non-state cases with section 1983 precedent; it repeated an earlier statement that section 1983 requires a violation of a private federal right and not just a federal law, id. at 282-83 (citing Blessing v. Freestone, 520 U.S. 329, 340 (1990)); and it indicated that nothing short of "an unambiguously conferred right" could support a claim under section 1983 based on a federal funding statute. Id.

Prior to Gonzaga this court had held that at least in some circumstances, subsection (30)(A) could support a right of action by a provider. Visiting Nurse Ass'n v. Bullen, 93 F.3d 997, 1003-05 (1st Cir. 1996), cert. denied, 519 U.S. 1114 (2000). But

-16-

Gonzaga, which charted a firm course among prior Supreme Court precedents in some tension with one another, see 536 U.S. at 279-286, compels us to reexamine Bullen. An intervening Supreme Court decision trumps the usual rule that a panel decision is to be followed by a successor panel. Stewart v. Dutra Constr. Co., 230 F.3d 461, 467 (1st Cir. 2000).

Subsection (30)(A), unlike subsection (13)(A), has no "rights creating language" and identifies no discrete class of beneficiaries--two touchstones in Gonzaga's analysis, 536 U.S. at 287-88, and of those earlier cases on which Gonzaga chose to build. E.g., Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n.13 (1979). The provision focuses instead upon the state as "the person regulated rather than individuals protected," Sandoval, 532 U.S. at 289, suggesting no "intent to confer rights on a particular class of persons," or at least not providers. Id. (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). See also Evergreen Presbyterian Ministries Inc. v. Hood, 235 F.3d 908, 928-29 (5th Cir. 2000).

Admittedly, some traces of legislative history suggest that Congress assumed or favored the ability of providers to get relief for inadequate payment rates. Wilder v. Va. Hosp. Ass'n, 496 U.S. 498 (1990), relied on such legislative history in construing an earlier version of section (13)(A)--known as the Boren Amendment--to create a private right of action for Medicaid

-17-

service providers "to have the State adopt rates that it finds are reasonable and adequate rates to mean the costs of an efficient and economical health care provider." 496 U.S. at 524.[4] In Bullen, we held that because the Boren Amendment and subsection (30)(A) contained nearly identical substantive requirements, Wilder supported the use of section 1983 to enforce subsection (30)(A).

However, following Wilder Congress in 1997 repealed the Boren amendment and replaced it with narrower language in the present subsection (13)(A) for the very purpose of increasing the flexibility of the states. See Evergreen, 197 F.3d at 657. Although Gonzaga did not overrule Wilder's construction of the now repealed Boren amendment, Gonzaga requires clear statutory language for the creation of private rights enforceable under section 1983 at least where based upon federal funding statutes. 536 U.S. at 283, 290. Subsection (30)(A) does not provide explicit rights for providers.

Long Term suggests that the failure to provide a private right of action would render subsection (30)(A) a nullity. That concern was noted by the Supreme Court in Wilder, 496 U.S. at 514, a decision on which Bullen itself relied. But in the present case the Secretary has ample authority to enforce subsection (30)(A) in

_____

[4]See Wilder, 496 U.S. at 517-18 (quoting S. Rep. No. 94-1240, at 4, U.S.C.C.A.N. 1976, at 5651); Ark. Med. Soc'y v. Reynolds, 6 F.3d 519, 526 (8th Cir. 1993). But see Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d 531, 541 (3d Cir.), cert. denied, 537 U.S. 821 (2002)(finding the legislative history inconclusive).

the ways already described.  Under <u>Gonzaga</u>, the presence of an explicit enforcement mechanism weighs against inferring private rights of action.  536 U.S. at 289-90.  This is decidedly not a situation lacking an outside watchdog.

Five justices joined the Court's <u>Gonzaga</u> opinion outright but two more, in an opinion by Justice Breyer, stressed similar criteria without endorsing the majority's strong tilt against implied private rights.  Yet Justice Breyer noted, as one more point favoring the result in <u>Gonzaga</u>, the fact that "much of the statute's key [substantive] language is broad and nonspecific," suggesting that exclusive agency enforcement might fit the scheme better than a plethora of private actions threatening disparate outcomes.  <u>Id.</u> at 292 (Breyer, J., joined by Souter, J., concurring in the judgment).

Subsection (30)(A) presents the same concern.  The criteria (avoiding overuse, efficiency, quality of care, geographic equality) are highly general and potentially in tension.  And read literally the statute does not make these directly applicable to individual state decisions; rather state plans are to provide "methods and procedures" to achieve these general ends.  42 U.S.C. § 1396a(a)(30)(A) (2000).  Thus, the generality of the goals and the structure for implementing them suggests that plan review by the Secretary is the central means of enforcement intended by Congress.

Prior to <u>Gonzaga</u>, whether subsection (30)(A) authorized private rights for providers was a close question; the circuits were split on the issue, and well reasoned opinions had been written on both sides.[5]  If <u>Gonzaga</u> had existed prior to <u>Bullen</u>, the panel could not have come to the same result.  Whether <u>Gonzaga</u> is a tidal shift or merely a shift in emphasis, we are obligated to respect it, and it controls this case.  Providers such as pharmacies do not have a private right of action under subsection (30)(A); if they think that state reimbursement is inadequate--and cannot persuade the Secretary to act--they must vote with their feet.

On a contingent basis, the Commonwealth argues that even if Long Term's claims under both subsections were not barred as a matter of law, the district court still erred in granting the injunction.  It asserts that the district court wrongly presumed injury from supposed violations of technical requirements (lack of prior comments and a formal finding); speculated about potential harm to "third parties" (nursing home patients); and ignored

---

[5]<u>Compare</u> <u>Pa. Pharmacists Ass'n</u>, 283 F.3d at 541-42, <u>and</u> <u>Walgreen Co.</u> v. <u>Hood</u>, 275 F.3d 475, 478 (5th Cir. 2001), <u>cert. denied</u>, 536 U.S. 951 (2002)(no right of action), <u>with</u> <u>Westside Mothers</u> v. <u>Haveman</u>, 289 F.3d 852, 863-64 (6th Cir.), <u>cert. denied</u>, 537 U.S. 1045 (2002), <u>Methodist Hosps.</u> v. <u>Sullivan</u>, 91 F.3d 1026, 1029 (7th Cir. 1996), <u>Bullen</u>, 93 F.3d at 1005-06, <u>and</u> <u>Ark. Med. Soc'y</u>, 6 F.3d at 525-28 (right of action).  <u>Orthopaedic Hosp.</u> v. <u>Belshe</u>, 103 F.3d 1491 (9th Cir. 1997), assumed a right of action but the issue was apparently not raised.

alleged means by which Long Term members could recoup if the Division had erred in adopting the new rate.

Our legal conclusions spare us the need to pursue these issues, but several observations are in order. Nothing we have seen suggests that the Division is unconcerned about assuring that nursing home residents receive their drugs, is indifferent to the survival of pharmacies that provide them, or has acted with indifference to those concerns solely in order to save the state money. It was the legislature that proposed WAC minus 2% and the Division that resisted; the rate it now defends is 7 percentage points higher than the legislature's target.

Nor, in the abstract, is there anything patently wrong with the Division's arguing that it has power to act on an emergency basis, or its desire to see whether supply can be maintained after a 1% reduction. See Methodist Hosps. v. Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996). Admittedly, it is open to dispute whether this was an emergency so severe as to preclude prior comments. And, the lack of a formal finding that WAC plus 5% would elicit adequate supply has perhaps proved to be imprudent.

At the same time, the position of the pharmacies is little short of remarkable. They have apparently declined to give the Division the full range of raw cost data that it needs in order

to fine tune its rates;[6] and when the Division responded by making its best guess and then trying a modest market test through a further small reduction, Long Term's members sued, offering dire predictions of disaster--but again no adequate cost data. If pharmacy interests alone were of concern, the lack of equity is so patent that an injunction would be unthinkable.

Of course, the district judge was primarily concerned not with the pharmacies but with nursing home residents, and this was a proper concern in granting or denying a preliminary injunction. New Comm Wireless Servs., Inc., 287 F.3d at 8-9. But even if one mistrusted the Division's priorities, the Secretary of HHS and the nursing homes are presumptively better guardians of the residents' overall interests than are these plaintiffs. Medicaid money that is spent unnecessarily on drugs is unavailable for other uses.

Our earlier discussion leads us to conclude that Long Term's members, and thus Long Term, have no claim under either subsection and that the preliminary injunction must be vacated. This may well entail dismissal of the case as a whole, but that issue has not been briefed and is a matter for the district court

---

[6]Long Term members supplied some data, but the Division said it was incomplete and inadequate to permit verification. And, assuming that concerns about proprietary information are real, there are numerous techniques (e.g., averaging by the Division of anything released publicly) to ameliorate or eliminate such problems. Cf. 8 Wright & Miller, Federal Practice and Procedure, § 2043 (2d ed. 1994) (discussing various methods courts can use to protect proprietary information under Fed. R. Civ. P. 26(c)).

in the first instance.  Under the circumstances, our mandate will issue forthwith, although without prejudice to petitions for rehearing or rehearing en banc in the usual course.  See U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC, 339 F.3d 23, 35 (1st Cir. 2003).

The preliminary injunction is vacated and the matter remanded to the district court.  The mandate will issue immediately.

It is so ordered.