E. Mitchell ROOB, Jr., in his individual Capacity as Secretary of the Indiana Family And Social Services Administration, Jeanne Labrecque, in her individual capacity and as Assistant Secretary, Indiana Office of Medicaid Policy and Planning, Indiana Family and Social Services Administration, and Indiana Office of Medicaid Policy and Planning, Appellants–Defendants,

v.

Jannis FISHER, et al., Appellees–Plaintiffs.

No. 49A02–0602–CV–103.

Court of Appeals of Indiana.

Nov. 8, 2006.

Steve Carter, Attorney General of Indiana, Barbara A. Nardi and Frances Barrow, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellants.

Thomas R. Ruge and Steven W. Griesemer, Lewis & Kappes, P.C., Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellants-defendants E. Mitchell Roob, et al. (collectively, the State), appeal from two orders entered by the trial court in which the court (1) found that Medicaid transportation providers and recipients have a private right of action pursuant to 42 U.S.C. section 1983 (Section 1983) and determined that the State's Medicaid transportation reimbursement rates were inadequate under applicable federal law; and (2) ordered that the mileage reimbursement rate be increased from $1.25 per mile to $1.85 per mile.

The State raises a number of arguments, one of which we find dispositive—that the trial court erred as a matter of law in determining that Medicaid transportation providers and recipients have a private right of action under Section 1983.

Pursuant to a recent United States Supreme Court opinion and the application thereof by a number of federal appellate courts, we find that neither the providers nor the recipients have a private right of action pursuant to Section 1983. Consequently, we reverse the judgment of the trial court and direct it to vacate the orders at issue and enter judgment in favor of the State.

### FACTS

We have had occasion to consider this case once before, and the underlying facts, as described in our previous opinion, are as follows:

Indiana provides health care for low-income patients through the Medicaid program. Part of the program funding comes from the federal treasury, and federal officials oversee the program jointly with the Indiana Medicaid agency. To receive the federal funding, Indiana must comply with the federal Medicaid regulations. Those regulations require Indiana to assure that Medicaid patients have transportation to and from health care providers' offices. Indiana fulfills this requirement by contracting with transportation businesses to serve Medicaid patients.

In 1992, the cost of the requisite transportation services rivaled the cost of physician services: $399 per patient for transportation versus $461 per patient for physician services. The cost included wheelchair accessible services, termed "nonambulatory services" and known by the acronym NAS, as well as transportation for patients able to walk, termed "commercial ambulatory services" or CAS. Indiana's transportation costs concerned federal Medicaid officials, and in 1992–93 federal officials audited Indiana's program with the stated objective of determining "methods for controlling future CAS transportation costs." The officials estimated that in 1990, Indiana's CAS cost was nearly sixteen million dollars. In the audit report, the federal officials offered three suggestions for reducing CAS costs: pay lower rates to transportation providers, pursue less expensive transportation alternatives, and eliminate unjustified transportation claims. The federal officials estimated that these cost-saving measures could reduce Indiana's annual CAS expense by about six million dollars.

In March 1993, the Medicaid agency issued bulletins announcing new, lower rates it would pay to transportation providers. Formerly, the maximum rate for CAS providers (other than taxis) was $15, plus $2.00 per mile for out-of-county mileage. The new CAS maximum rate would be $10, plus $1.25 per mile after ten miles, regardless of whether the trip involved out-of-county miles. The NAS rate was formerly $30 plus $2.00 per mile for out-of-county mileage; the new rate would be $20 plus $1.25 per mile.

A group of Medicaid transportation providers (the Providers) and patients filed a complaint against the Medicaid agency in Marion Superior Court, challenging the new rates and seeking an injunction, a writ of mandamus and a declaratory judgment. The Providers alleged the new rates violated Indiana and federal law and sought damages for payments withheld or denied by the Medicaid agency. The agency removed the action to the United States District Court for the Southern District of Indiana.

*Gorka v. Sullivan*, 671 N.E.2d 122, 123–24 (Ind.Ct.App.1996) (citations omitted), *trans. denied.* On July 29, 1994, the federal district court remanded the State law claims to State court for resolution. The

plaintiffs' federal law claims remained in the federal district court.

### State Law Claims Following Remand to State Court

After remand of the State law claims to State court, the appellees-plaintiffs who were Medicaid transportation providers (the Providers) sought class certification under Indiana Trial Rule 23. The trial court certified a class consisting of all CAS and NAS Providers who were certified common carriers in Indiana.[1] Neither the State nor federal court has certified a class consisting of the appellees-plaintiffs who are Medicaid recipients (the Recipients),[2] though a motion for class certification is currently pending in the trial court.

Both sides filed motions for summary judgment on the State law claims and the trial court granted summary judgment on those claims in favor of the State. The Appellees appealed and we affirmed the trial court's decision. *Gorka*, 671 N.E.2d at 133. Our Supreme Court denied transfer on January 22, 1997, so the State law claims in this action are no longer at issue herein.

### Federal Law Claims

On August 10, 1995, the federal district court entered final judgment in favor of the State on the Appellees' remaining federal law claims. The Providers appealed that judgment and on May 6, 1996, the Seventh Circuit Court of Appeals vacated the district court's decision for lack of

jurisdiction based on the doctrine of sovereign immunity. *Gorka v. Sullivan*, 82 F.3d 772, 775 (7th Cir.1996). On February 6, 1997, the district court remanded the remaining federal law claims to the trial court. Following that remand, the Appellees filed a second amended complaint on November 4, 1999.[3]

At the heart of the Appellees' federal law claims is an argument that the State's Medicaid transportation reimbursement rates violate 42 U.S.C. section 1396a(a)(30)(A) (Section 30(A)), a right that they seek to enforce through Section 1983. Following a bench trial on April 8 and 19, 2004, the trial court ruled in favor of the Appellees and entered findings of fact and conclusions of law on June 24, 2004 (the June 24 order). The June 24 order provides, in pertinent part, as follows:

> Each of the [Recipients] has a chronic and severe medical condition or conditions requiring frequent medical attention. Each of the [R]ecipients is dependent upon the Indiana Medicaid program for transportation to and from needed medical care.

> \* \* \*

> Services are provided to that segment of Indiana's population who do not own cars or have other means of transportation and are reliant upon others, including the social welfare system, for transportation to health care providers....

---

1. The certified class is defined as:
   All [CAS] providers and all [NAS] providers who, as of May 1, 1993, were certified common carriers pursuant to the Indiana Motor Carrier Act, I.C. § 8–2.1–22 *et seq.*, and had rates for such services on file with the Indiana Department of Revenue, who also are certified Indiana Medicaid providers under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and who submitted claims for reimbursement to the

   Indiana Family and Social Services Administration, through its fiscal contractor, EDS ("Electronic Data Systems Corporation"), for services provided after May 1, 1993. Appellants' App. p. 1278.

2. We will refer to the Providers and the Recipients collectively as the Appellees.

3. The Appellees had filed their first amended complaint in federal district court.

\* \* \*

Since May 1, 1993[,] costs continued to rise for [P]roviders. Every category of expense has increased. For example, costs for insurance of a wheelchair van have gone from $1,400.00 per year to $8,000.00 per year. . . .

\* \* \*

Thus, the legislative mandate to cut Medicaid expenditures severely came at a time when transportation services were being utilized at an increasingly higher rate with increasingly higher costs for [P]roviders.

\* \* \*

. . . [The State] made no effort, in advance of the implementation of the lower rates, to determine the impact . . . the reimbursement rate reduction would have on access to healthcare for [Recipients]. Rates were reduced below [P]roviders' operating costs with the hope that [the State] would respond to the inevitable denial of access to medical care *after* there is an inadequate amount of transportation services available for [Recipients]. . . .

That is to say, denial of access will occur first and, if detected, it will be addressed. [The then-Assistant Secretary of the Indiana Family and Social Services Administration] was singularly unconcerned about the well being of [R]ecipients, stating that if deaths occurred, [the State] would make a statistical review of the matter.

\* \* \*

. . . In fact there is no alternative transportation system to the [Provider] class, and access to transportation for medical care is being eliminated by [the State's] rate cuts.

\* \* \*

The effect on [the Providers] has been devastating. The reductions have brought reimbursement rates to a level that is substantially below the [P]roviders' operating costs. . . . Operating losses for [P]roviders have run in the tens of thousands of dollars per month since the date the new rates were imposed.

\* \* \*

[For example, one Provider] cut back its equipment, could not repair equipment, closed offices, curtailed services from its large geographically authorized service territory to only Jefferson and adjacent counties and routinely refused requests of [Recipients] for transportation service because [the Provider] could not afford to pick people up at reduced levels of reimbursement. . . .

. . . Under these circumstances, . . . other Providers will be closing their services to [Recipients].

\* \* \*

. . . [The] reductions in levels of reimbursement have directly impacted the quality and quantity of [CAS] and [NAS] services available to meet the needs of [Recipients] in Indiana. . . .

\* \* \*

. . . [C]hanges in administration of the Medicaid program and cuts in levels of reimbursement for Medicaid transportation have driven [Providers] out of the market leaving the disabled population of Indiana in at least fifteen (15) counties with little or no Medicaid transportation. . . .

\* \* \*

By contrast, transportation services remain available to those who can pay

for travel to their health care providers, either out of their own pockets or through insurance or other payors.... Where private insurance is available or where patients can pay themselves, the charges that are paid are the tariff rates on file with the Indiana Department of Revenue, which are significantly higher than the Medicaid rates ($30.00 compared with $19.00 per trip)....

Individual Medicaid recipients have continued to have problems with transportation to their health care providers.... [Recipients] are without other means for transport to health care providers if transportation services would become unavailable through the Medicaid program.

Because [the State] failed to take the appropriate steps and make the proper considerations, an essential element of Medicaid's health delivery system has been emasculated, leaving those people least able to cope with transportation difficulties without access to needed health care.

\* \* \*

[Section 30(A)] sets forth standards regarding reimbursement, including the "equal access" provision. It is well established in case law that this provision is enforceable against state officials in lawsuits brought by both [Recipients] and [Providers]. *Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491 (9th Cir.1997); *Arkansas Medical Soc'y, Inc. v. Reynolds,* 6 F.3d 519 (8th Cir.1993); *Methodist Hospitals, Inc., et al., v. Sullivan, et al.,* 91 F.3d 1026 (7th Cir.1996); *see also La Salle Ambulance, Inc. v. Merrifield et al.,* 237 A.D.2d 960, 654 N.Y.S.2d 930 (N.Y.A.D.1997) (holding low reimbursement for Medicaid transportation violated federal law); *see also Clayworth v. Bonta,* 295 F.Supp.2d 1110 (E.D.Cal.

2004) holding pharmacists have standing to challenge violations of "equal access" provision).

\* \* \*

... Transportation services to medical examinations and treatment is [sic] specifically required under federal regulations.... In order to obtain approval of the state plan, the [State] included a broad range of transportation services, holding forth to the public and the federal government that these services would be provided to eligible [Recipients].

\* \* \*

... [T]his Court finds that the reimbursement rates for transportation services under Indiana's Medicaid program violate [Section 30(A)] in that reimbursement in accordance with the rate schedules imposed May 1, 1993 are not consistent with efficiency, economy and quality of care and are not sufficient to enlist enough providers so that care and services are available to eligible [Recipients] to the extent they are available to the general public.

\* \* \*

[The State is] ORDERED to ... recalculate [Provider] reimbursement rates, consider costs of [P]rovider operation when establishing new rates, and to report to this Court the new rates, the methodology used and the basic data underlying [the State's] conclusions;

\* \* \*

Judgment is ENTERED in favor of [the Appellees] and against [the State]. Appellants' App. p. 45–71. Following a second bench trial on issues remaining after the June 24 order, the court entered an order on November 21, 2005, directing that the mileage reimbursement rate should be

increased from $1.25 per mile to $1.85 per mile after the first ten miles of a trip. The State now appeals from both orders.

## DISCUSSION AND DECISION

■■■ Before turning to the State's dispositive argument, we observe that because the trial court entered findings of fact and conclusions of law, we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Goodwine v. Goodwine*, 819 N.E.2d 824, 828 (Ind.Ct. App.2004). In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We do not reweigh the evidence and consider only the evidence favorable to the trial court's judgment. *Id.* Challengers must establish that the trial court's findings are clearly erroneous, which occurs when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* We do not defer to conclusions of law, however, and evaluate them de novo. *Id.*

### I.  Section 1983

■■ The Appellees have raised a Section 1983 claim against the State for an alleged violation of Section 30(A). Section 1983 "imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). To state a cause of action pursuant to Section 1983, a plaintiff cannot merely assert that a federal statute was violated; rather, she must assert that a federal *right* that she possessed was violated. *Id.* The *Blessing* Court held that three factors must be examined to determine whether a statutory provision creates a federal right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340–41, 117 S.Ct. 1353 (citations omitted).

In 2002, the United States Supreme Court considered, explained, and narrowed the circumstances under which federal statutes create private rights of action that are enforceable pursuant to Section 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). In *Gonzaga*, the Court acknowledged a certain amount of confusion stemming from its precedent on this issue, particularly *Blessing*:

> This confusion has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action.

*Id.* at 283, 122 S.Ct. 2268. Seeking to clarify the proper analysis with respect to this matter, the Court explicitly held as follows:

> We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section

1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights,* not the broader of vaguer "benefits" or "interests," that may be enforced under the authority of that section.

*Id.* (emphasis in original). To determine whether there is an "unambiguously conferred right" supporting a Section 1983 action,

> We must first determine whether Congress *intended to create a federal right.* Thus we have held that "[t]he question whether Congress ... intended to create a private right of action [is] definitively answered in the negative" where a "statute by its terms grants no private rights to any identifiable class." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). For a statute to create such private rights, its text must be "phrased in terms of the persons benefited." *Cannon v. University of Chicago,* 441 U.S. 677, 692 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

*Id.* at 283–84, 122 S.Ct. 2268 (emphasis, omission, and alterations in original).

■ Thus, the proper inquiry is no longer whether a would-be Section 1983 plaintiff is an intended beneficiary of the statute she seeks to enforce; rather, we must consider whether Congress intended to create a private right of action in that class of plaintiffs. Congressional intent is manifested by the presence—or absence—of statutory language granting private rights to an identifiable class. In other words, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286, 122 S.Ct. 2268.

## II.  Section 30(A)

In pertinent part, Section 30(A) requires that a State plan for Medicaid assistance must:

> Provide such methods and procedures relating to the utilization of and payment for care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area. . . .

42 U.S.C. § 1396a(30)(A). Both the Providers and the Recipients claim that Section 30(A) creates an individual right enforceable by them under Section 1983. "Their interests, however, though similar, are not congruent. [The Recipients'] claim requires us to decide whether § 30(A) creates a private right of action for recipients of Medicaid funding; the Providers' claim requires us to decide the same question with respect to providers of Medicaid services." *Sanchez v. Johnson,* 416 F.3d 1051, 1055–56 (9th Cir.2005).

### A.  Providers

■ Turning first to whether Section 30(A) creates a private right of action in the Providers pursuant to Section 1983, we note that the vast majority of federal appellate courts that have had occasion to consider this issue in the wake of *Gonzaga* have concluded that Section 30(A) does not bestow a private right of action upon providers. Specifically, the First, Sixth, Ninth, and Tenth Circuits have all concluded that providers are not entitled to raise a violation of Section 30(A) via Section 1983.

*See Mandy R. v. Owens,* 464 F.3d 1139, 2006 WL 2699039 (10th Cir. Sept.21, 2006); *Westside Mothers v. Olszewski,* 454 F.3d 532 (6th Cir.2006); *Sanchez v. Johnson,* 416 F.3d 1051, 1055–56 (9th Cir.2005); *Long Term Care Pharmacy Alliance v. Ferguson,* 362 F.3d 50 (1st Cir.2004) (reversing First Circuit's stance prior to *Gonzaga* that providers were entitled, pursuant to Section 1983, to raise a violation of Section 30(A)).[4] Only the Eighth Circuit has reached the opposite result. *See Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.,* 443 F.3d 1005 (8th Cir. 2006).

The courts that have concluded that the providers do not have a private cause of action under Section 1983 have based their opinions on three characteristics of Section 30(A). First, Section 30(A) has "an aggregate focus rather than an individual focus that would evince congressional intent to confer an individually enforceable right." *Westside Mothers,* 454 F.3d at 542. Specifically, the only reference in Section 30(A) to providers is "as indirect beneficiaries 'enlisted' as subordinate partners in the administration of Medicaid services." *Id.* at 542–43. Thus, "it would strain common sense to read § 30(A) as creating a 'right' enforceable by them." *Sanchez,* 416 F.3d at 1059. Furthermore, "[a] statutory provision that refers to the individual only in the context of describing the necessity of developing state-wide policies and procedures does not reflect a clear Congressional intent to create a private right of action." *Id.* Thus, far from focusing on a

specific class of beneficiaries, Section 30(A) is merely a yardstick by which a State's performance of its Medicaid program can be measured. *Westside Mothers,* 454 F.3d at 543. Indeed, the purpose of Section 30(A) is to regulate the State rather than to protect individuals. *Long Term Care,* 362 F.3d at 57.

Second, Section 30(A)'s broad and non-specific language is ill-suited to judicial remedy. *Westside Mothers,* 454 F.3d at 543. Although Congress included general objectives, including "efficiency, economy, and quality of care," § 1396a(a)(30)(A), it did not identify specific standards with which the State must comply. *Westside Mothers,* 454 F.3d at 543. The interpretation and balancing of these nebulous, competing, and indeterminate goals "would involve making policy decisions for which this court has little expertise and even less authority." *Sanchez,* 416 F.3d at 1060. Thus, these "flexible, administrative standards" do not reflect a legislative intent to provide a private cause of action for their violation. *Id.* at 1059.

Third, Section 30(A) is not confined to particular services; rather, it speaks generally of "methods and procedures." § 1396a(a)(30)(A). Such broad language, which affects a number of competing interests and objectives, suggests that Section 30(A) is "concerned with overall methodology rather than conferring individually enforceable rights on individual" providers. *Sanchez,* 416 F.3d at 1059–60.

The Eighth Circuit, on the other hand, has concluded that Section 30(A) *does* cre-

---

**4.** The Third and Fifth Circuits have also concluded that providers do not have a private cause of action under Section 1983 to raise a violation of Section 30(A), but inasmuch as their opinions were published prior to *Gonzaga,* the analysis therein is of limited value. *See Penn. Pharmacists Ass'n v. Houstoun,* 283 F.3d 531 (3rd Cir.2002); *Walgreen Co. v. Hood,* 275 F.3d 475 (5th Cir.2001).

Similarly, we note that the cases relied upon by the trial court were all published many years prior to *Gonzaga,* with the exception of *Clayworth.* Appellants' App. p. 63–64. But *Clayworth,* a 2004 opinion, was reversed in 2005. 140 Fed.Appx. 677 (9th Cir.2005). Consequently, we do not find the authority relied upon by the trial court to be compelling on this issue.

ate a private right of action in providers pursuant to Section 1983. Finding that *Gonzaga* did not require it to reverse prior caselaw, the Eighth Circuit concluded that to determine congressional intent regarding the creation of a private cause of action, "one must consider the benefit conferred by the statute, the intended beneficiary, and whether the statute provides for some type of enforcement action short of a private cause of action." *Pediatric Specialty,* 443 F.3d at 1015. As to Section 30(A), the Eighth Circuit concluded that it "requires states to provide methods and procedures for payment of care and services in a manner that ensures equal access to quality care for needy children. The beneficiaries are both the recipients of the services and the recipients of the state's payment, who are the [providers]." *Id.* Thus, Congress intended to bestow an enforceable federal right upon both providers and recipients.

The *Pediatric Specialty* court also considered a prior United States Supreme Court opinion that concluded that providers had an enforceable right to payment under Section 30(A). *Id.* (analyzing *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)). The *Wilder* opinion, however, was based upon a version of Section 30(A) that has since been repealed. Moreover, the *Wilder* Court primarily examined whether the providers were the "intended beneficiaries" of Section 30(A). *Wilder,* 496 U.S. at 510, 110 S.Ct. 2510. Although *Gonzaga* did not explicitly overrule *Wilder,* it is apparent that it severely curtailed *Wilder's* applicability, inasmuch as whether a would-be plaintiff is an intended beneficiary of the statute at issue is no longer the proper inquiry.

Under these circumstances, we agree with our sister court in the Tenth Circuit that we

must respectfully disagree [with the holding in *Pediatric Specialty.*] Despite the fact that ... providers ultimately benefit from competent administration, they are nowhere identified in the statutory provision as a class of beneficiaries. And *Gonzaga* requires not a vague benefit or interest but rather an 'unambiguously conferred right.' 536 U.S. at 283, 122 S.Ct. 2268, 153 L.Ed.2d 309. In sum, because the provision does not confer enforceable federal rights on identified beneficiaries, *Gonzaga* precludes interpreting subsection 30(A) to create a federal right enforceable under § 1983.

*Mandy R.,* 464 F.3d 1139, 1148. Because we agree with the Section 30(A) analysis of the First, Sixth, Ninth, and Tenth Circuit Courts of Appeals, we conclude likewise that Congress did not intend to create an enforceable federal right in the Providers under Section 30(A). Thus, the trial court erred in entering judgment against the State with respect to the Providers.

### B. Recipients

■ Before addressing the substance of this issue, we must consider a procedural dispute raised by the Appellees. Specifically, they argue that the State has waived any argument regarding the Recipients' right to bring a Section 1983 action because it failed to address the Recipients in its opening brief. The State points out that it noted in its opening brief that a class of Recipients has not yet been certified and that the orders at issue in this appeal, although nominally including both the Providers and the Recipients, did not award any relief to the Recipients. Consequently, the State argues, if we find that the Providers have no right to bring a Section 1983 action in this case and direct the trial court to vacate the orders with respect to the Providers, the case is over, inasmuch as the only relief granted therein

was reimbursement increases to the Providers.

Although the State is correct that a class of Recipients has not yet been certified, we must still consider whether the individual Recipients who are parties to this case have a right to pursue a Section 1983 cause of action against the State. Moreover, although the trial court's orders did not award the Recipients any relief, the orders entered judgment in favor of the Recipients. To determine whether Recipients are, in fact, entitled to judgment in their favor, we must consider whether they are entitled to bring the underlying claims at issue. As to whether the State has waived this argument, we conclude that it sufficiently addressed the Recipients' status in its opening brief to keep the argument alive in this appeal. Moreover, as noted below, because the analysis with respect to Recipients and Providers is virtually identical, most of the cases and rules to which the State cites in its opening brief are equally applicable to both groups of Appellees. Consequently, we conclude that the State has not waived this argument.[5]

As to the Recipients' right to pursue a Section 1983 cause of action based on an alleged violation of Section 30(A), our analysis is virtually identical to that detailed above with respect to the Providers. The Sixth, Ninth, and Tenth Circuits have concluded that Section 30(A) does not create a private cause of action in *either* providers or recipients. *See Sanchez; Westside Mothers; Mandy R.; see also Long Term Care* (court did not reach a conclusion with respect to recipients because their rights were not at issue in that case).

■ As with providers, Section 30(A) creates no identifiable class of rights-hold-

ers in the recipients. Although recipients certainly benefit from efficient Medicaid administration, that indirect benefit is insufficient after *Gonzaga* to create a federal right absent specific statutory language to that effect. *Sanchez,* 416 F.3d at 1062 (extending the analysis of *Long Term Care* to recipients as well as providers). The broad and diffuse language of the statute applies identically to the recipients and the providers. Moreover, the only reference in Section 30(A) to the recipients "is in the aggregate, as members of 'the general population in the geographic area.'" *Westside Mothers,* 454 F.3d at 542 (quoting Section 30(A)). Thus, there is no language in Section 30(A) evincing Congressional intent to create an enforceable right in the Recipients. As aptly put by the *Westside Mothers* court, "we are not persuaded that Congress has, with a clear voice, intended to create an individual right that either Medicaid recipients or providers would be able to enforce under § 1983." *Id.* at 543. We conclude, therefore, that the trial court erred in granting judgment in favor of the Recipients.

As a final aside, we note that we are compelled by United States Supreme Court precedent to arrive at this result. We do so reluctantly, however, because we also believe that the restrictive analysis required by federal case law and the recent amendments by Congress render the Medicaid Act's "equal access" provisions merely illusory. Moreover, we believe that the trial court was correct in determining that the practical consequences of writing and reading the Medicaid Act and operating the Medicaid program in such a manner will be extremely deleterious to those most in need. While recognizing that others are charged with the responsibility of making those decisions, we can

---

**5.** We are entering an order contemporaneously with this opinion denying the Appellees' motion to strike portions of the State's reply brief and supplemental appendix.

only lament their apparent indifference to the plight of Medicaid providers and recipients.

The judgment of the trial court is reversed with instructions to vacate the orders at issue and enter judgment in favor of the State.

VAIDIK, J., and CRONE, J., concur.