**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 12-3401 and 12-3501
_____

CHRIST THE KING MANOR, INC.; BALDOCK
ASSOCIATES, d/b/a Baldock Health Care Center;
BONHAM NURSING CENTER; BRIARLEAF NURSING
AND CONVALESCENT CENTER, INC.; BROOKMONT
HEALTH CARE CENTER, LLC; CATHEDRAL VILLAGE;
ELLEN MEMORIAL HEALTH CARE CENTER-
HONESDALE, INC.; GREENLEAF NURSING AND
CONVALESCENT CENTER, INC.; HUMBERT LANE
ASSSOCIATES, d/b/a Humbert Lane Nursing and
Rehabilitation Center; JEWISH HOME OF GREATER
HARRISBURG; KINKORA PYTHIAN HOME
CORPORATION; KUTZTOWN MANOR, INC.;
MISERICORDIA  CONVALESCENT HOME; CPSR
ASSOCIATES, LLC, d/b/a Mon Valley Care Center;
PICKERING MANOR HOME; 4144 SCHAPER AVENUE
OPERATING COMPANY, LLC, d/b/a Presque Isle
Rehabilitation & Nursing Center; RHEEMS NURSING AND
REHABILITATION, LLC; RESIDENCE FOR RENTAL
CARE AT SHADYSIDE, LTD; PERINI
SERVICE/SOUTHHAMPTON MANOR LIMITED, d/b/a
Shippensburg Health Care Center; SIEMON NURSING
HOME, INC.; WINDSOR, IN.C, d/b/a Snyder Memorial
Health Care Center; SOUTHWESTERN GROUP, LTD, d/b/a

Southwestern Nursing Center; CARBON-SCHUYLKILL COMMUNITY HOSPITAL, INC., d/b/a St. Luke's Miners Memorial Geriatric Center; SUSQUEHANNA VALLEY NURSING AND REHABILITATION CENTER, LLC; 890 WEATHERWOOD LANE OPERATING COMPANY, LLC, d/b/a The Rehabilitation and Nursing Center at Greater Pittsburgh; WESTWOOD OPERARTOR, L.P., d/b/a Village at Pennwood; MISERICORDIA CONVALESCENT HOME

v.

SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHARLENE FRIZZERA, in her official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services (CMS); HARRIET DICHTER, in her official capacity as Secretary of Public Welfare for the Commonwealth of Pennsylvania, Department of Public Welfare

CHRIST THE KING MANOR, INC.; BONHAM NURSING CENTER; CATHEDRAL VILLAGE; ELLEN MEMORIAL HEALTH CARE CENTER-HONESDALE, INC.; SUSQUEHANNA VALLEY NURSING AND REHABILITATION CENTER, LLC; RHEEMS NURSING & REHABILITATION, LLC SOUTHWESTERN GROUP, LTD. d/b/a Southwestern Nursing Center; CPSR ASSOCIATES, LLC d/b/a Mon Valley Care Center; KINKORA PYTHIAN HOME CORP.; SIEMON NURSING HOME, INC. d/b/a Siemon's Lakeview Manor Estate; 4114 SCHAPER AVENUE OPERATING CO., LLC d/b/a Presque Isle Rehabilitation & Nursing Center; 890 WEATHERWOOD LANE OPERATING COMPANY, LLC d/b/a The Rehabilitation and Nursing

center at Greater Pittsburgh; BRIARLEAF NURSING &
CONVALESCENT CENTER, INC.; BROOKMOMT
HEALTH CARE CENTER; KUTZTOWN MANOR, INC.;
GREENLEAF NURSING AND COVALESCENT CENTER;
WINDOSR, INC. d/b/a Snyder memorial Health Care Center;
CARBON-SCHUYKILL COMMUNITY HOSPITAL, INC.
d/b/a St. Luke's Miner's Memorial Geriatric Center;
PICKERING MANOR HOME,

Appellants in 12-3401

BALDOCK ASSOCIATES, d/b/a Baldock Health Care
Center; HUMBERT LANE ASSOCIATES, d/b/a Humbert
Lane Nursing and Rehabilitation Center,

Appellants in 12-3501

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 09-cv-02007)
District Judge:  Hon. John E. Jones, III

_____

Argued: May 31, 2013

Before:  JORDAN and VANASKIE, *Circuit Judges*, and
RAKOFF*, *Senior District Judge.*


_____
        * Honorable Jed S. Rakoff, United States District
Court Senior Judge for the Southern District of New York,
sitting by designation.

(Filed: September 19, 2013)
_____

Daniel K. Katirboff   [ARGUED]
Capozzi & Associates
P.O. Box 5866
Harrisburg, PA   17110
        *Counsel for Appellants*

Sheila Lieber
United States Dep't of Justice
Federal Programs Branch
901 E Street, NW
Washington, DC   20004

Jeffrey E. Sandberg   [ARGUED]
United States Dep't of Justice
Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC   20530
        *Counsel for Appellees*

Patrick S. Crawley
Sean A. Kirkpatrick   [ARGUED]
Office of Attorney General of Pennsylvania
Strawberry Square – 15th Fl.
Harrisburg, PA   17120
        *Counsel for Appellee Harriet Dichter*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This appeal arises from a challenge to the approval by the Secretary of the United States Department of Health and Human Services ("the Secretary" or "HHS") of a 2008 amendment to Pennsylvania's state plan for administering its Medicaid program. Numerous private nursing facilities that provide services to Medicaid recipients argue that the state plan amendment, or "SPA," violates Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (the "Medicaid Act" or the "Act"). Specifically, they contend that the SPA adjusted Pennsylvania's method for determining Medicaid reimbursement rates to private nursing facilities for the 2008-09 fiscal year without considering quality of care, which they say violates 42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)"), and without satisfying the public process requirements of 42 U.S.C. § 1396a(a)(13)(A) ("Section 13(A)"). To remedy those alleged violations, Plaintiffs invoke the Administrative Procedure Act (the "APA") and the Supremacy Clause of the Constitution, and seek declaratory and injunctive relief against the Secretary, the Administrator of the Centers for Medicare and Medicaid Services ("CMS") (collectively, the "Federal Defendants"), and the Secretary of Pennsylvania's Department of Public Welfare ("DPW" or the "State Defendant").[1] The District Court granted in part the

---

[1] When the nursing facilities first brought suit, the Secretary of DPW was Estelle B. Richman, and the Administrator of CMS was Charlene Frizzera. Since then, others have served in both positions. The current Secretary of DPW is Gary D. Alexander, and the current Administrator of CMS is Marilyn Tavenner. Kathleen Sebelius has been the Secretary of HHS since the complaint was filed.

Defendants' motions to dismiss, and then entered summary judgment in their favor on the remaining claims. For the reasons that follow, we will affirm those rulings in part and reverse them in part.

## I.    **Background**

### A.    *Factual and Statutory Background*

Medicaid is "a cooperative federal-state program that provides medical care to needy individuals." *Douglas v. Indep. Living Ctr. of S. Cal.*, 132 S. Ct. 1204, 1208 (2012). States that choose to participate in the program are responsible for developing and implementing a state Medicaid plan and have considerable control over the plan's details and administration. *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 533 (3d Cir. 2002) (en banc) (citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990)). In order to qualify for federal funding, however, a state plan must comply with the requirements of the Medicaid Act. 42 U.S.C. § 1396a (defining the requirements a state plan must satisfy for approval); *id.* § 1396b(a) (providing for federal payments "to each [s]tate which has a plan approved"). Those requirements include, among other things, the so-called "equal access provision" of Section 30(A), which mandates that a state plan provide "methods and procedures" to assure that the state pays participating nursing facilities and other Medicaid providers at rates that are consistent with efficiency, economy, quality of care, and adequate access to providers by Medicaid beneficiaries. 42 U.S.C. § 1396a(a)(30)(A); *see Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 522 (8th Cir. 1993) (explaining that Section 30(A) "is typically called the equal access provision"). State plans must also satisfy

6

Section 13(A) of the Act, which requires that rates of payment to hospitals and nursing facilities be determined using a public process similar to notice-and-comment rulemaking. 42 U.S.C. § 1396a(a)(13)(A).

CMS is the division of HHS tasked with ensuring that state plans comply with those and other requirements of the Medicaid Act. States must submit their proposed plans to CMS, and the agency must review each plan, "make a determination as to whether it conforms to the requirements for approval," 42 U.S.C. § 1316(a)(1), and "approve any plan which fulfills the conditions specified" in the Medicaid Act, 42 U.S.C. § 1396a(b). *See also* 42 C.F.R. § 430.12 (describing the submittal of state plans to CMS). A state may later amend an approved plan, but any amendments must also be submitted to CMS, and the agency must "determine whether the [amended] plan continues to meet the requirements for approval." 42 C.F.R. § 430.12(c)(2)(i). States are required to amend their plans "whenever necessary to reflect," among other things, "[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." *Id.*

Pennsylvania has elected to participate in the Medicaid program, and it has designated DPW as the "single [s]tate agency" responsible for creating and administering the state's Medicaid plan.[2] *See* 42 U.S.C. § 1396a(a)(5) (requiring states to establish or designate "a single [s]tate agency to administer … the plan"). Since 1996, Pennsylvania, in accordance with

---

[2] Recognizing that Pennsylvania is typically referred to as a "Commonwealth," we nonetheless use the term "state," for ease of reference.

7

an approved state plan, has paid participating nursing facilities for Medicaid-related services using an "annual prospective payment rate" often referred to as the "case-mix rate."[3]  *See* 55 Pa. Code § 1187.95 ("Prices will be set prospectively on an annual basis … ."); *Christ the King Manor v. Pennsylvania*, 911 A.2d 624, 630 (Pa. Commw. Ct. 2006) ("Since July 1996, DPW compensated both public and private nursing facilities through its [Medicaid] program under what is known as the case-mix payment system."). DPW calculates the "case-mix rate" using a complex formula that produces an individualized per diem reimbursement rate for each facility based on the "allowable costs" incurred by facilities,[4] the acuity level of residents,[5] and other factors. *See* 55 Pa. Code § 1187.96 (describing the "[p]rice and rate-setting computations").   (*See also* J.A. at 232-242 (Pennsylvania's State Plan).)   The rate is effective for one year, from July 1 through the following June 30, and it is adjusted quarterly, based on resident acuity. 55 Pa. Code § 1187.95(a).

---

[3]  Pennsylvania uses the term "rate" in this context to mean payment level, and we adopt that usage, even though "rate" is often used to refer to "the proportion by which quantity or value is adjusted."  *See* Black's Law Dictionary 1289 (8th ed. 2004).

[4]  Pennsylvania defines "allowable costs" as costs "which are necessary and reasonable for an efficiently and economically operated nursing facility to provide services to [Medicaid] residents."  55 Pa. Code Ann. § 1187.2.

[5]  "Acuity" refers to the severity of illness a patient experiences.  *See* Stedman's Medical Dictionary (28th ed.), at 22.

Under that methodology, Pennsylvania's reimbursement rates to nursing facilities have risen steadily each year, and, beginning in 2000, the state grew concerned that the pace of that inflation was creating unsustainable costs. In June 2005, DPW announced that reimbursement rates had increased by 29.4% over the previous five years, and that, unless rates were somehow limited, there would be "insufficient funds available to make case-mix payments to [Medicaid] nursing facilities in accordance with the existing case-mix payment methodology." 35 Pa. Bull. 3267 (June 4, 2005). Therefore, after soliciting public comments and receiving input from Pennsylvania's Medical Assistance Advisory Committee,[6] DPW proposed using a budget adjustment factor, or "BAF," to slow the increasing rates.

As it has come to be used in Pennsylvania, a BAF is a fraction by which each provider's case-mix payment rate is multiplied, thereby reducing the reimbursement rate by a certain percentage. For example, if a case-mix rate of $100 was multiplied by a BAF of 0.900, the resulting reimbursement rate would be $90, or 10% less than what was called for by the case-mix calculation. Under the methodology proposed by DPW in 2005, the size of the BAF was to be dictated by the funds appropriated by the state legislature for payments to nursing facilities for the 2005-06 fiscal year. Application of the BAF would therefore "cap" payments to providers based on budget allocation decisions by the Pennsylvania legislature. 35 Pa. Bull. 6232 (Nov. 12,

---

[6] States are required to "provide for a medical care advisory committee … to advise the Medicaid agency director about health and medical care services." 42 C.F.R. 431.12(b).

2005).  For the 2005-06 fiscal year, the BAF rate cap allowed payments to increase by 2.8% from the previous year. Although the BAF reduces the case-mix rate for a given year, that does not necessarily mean that the adjusted rate will be less than it was the previous year.  As described above, rates calculated using the case-mix methodology have steadily increased each year.  If an annual increase is larger than the reduction imposed by the BAF in that year, then rates can still increase in absolute terms.  For example, if rates increased under the case-mix methodology by five percent from one year to the next, and then the BAF reduced rates by three percent, there would still be an overall increase in rates from the previous year.

Although DPW initially portrayed the BAF as "an interim measure, applicable only to the computation of payment rates for the 2005-2006 fiscal year," *id.*, BAFs became a fixture of the state's rate-calculation methodology. For each year between 2005 and 2008, the Pennsylvania legislature authorized the use of a BAF, after which DPW submitted the BAF to CMS as a state plan amendment, and the agency approved the change.  As a result, the case-mix rate calculated for each of those years was reduced by the amount defined in that year's BAF; the 2005-06 rates were reduced by 4.878%, the 2006-07 rates by 6.245%, and the 2007-08 rates by 6.806%, as compared to what the rates would have been without the application of the BAF.[7]

---

[7]  The BAFs for those years were 0.95122, 0.93755, and 0.93194, respectively.  Because the annual case-mix rate is multiplied by the BAF, it is reduced by a certain percentage.  For example, if you multiply a case-mix rate by 0.95122, you arrive at a figure that is 95.122% of the original

10

On June 28, 2008, two days before the prior legislative authorization for a BAF was set to expire, DPW issued a public notice and request for comment announcing the state's intent to "authorize the continued use of a budget adjustment factor" in calculating nursing facility payment rates. 38 Pa. Bull. 3561 (June 28, 2008) (the "June Notice"). The June Notice explained that the continued use of a BAF would ensure that "the aggregate increase in the Statewide day-weighted average payment rate … does not exceed the percentage rate of increase permitted by the funds appropriated for nursing facility services." *Id.* It defined the formula for calculating the BAF, which, as in years 2005 to 2008, was determined by the amount the legislature allocated for nursing facility reimbursements. The June Notice also projected that for fiscal year 2008-09 the BAF would be 0.90551, meaning that the per diem rates under the case-mix method would be decreased by 9.449% from what they would have been without the application of the BAF. *Id.* That projection was based on the funds allocated for nursing facility services in the governor's proposed budget.

A week later, on July 4, 2008, the Pennsylvania legislature passed "Act 44," 62 Pa. Stat. Ann. § 443.1(7)(iii). As if the bureaucratese were not already painfully thick in this field, the Act directed DPW to apply what it called a "revenue adjustment neutrality factor," which is another term for a BAF, in each fiscal year between July 1, 2008 and June 30, 2011. 62 Pa. Stat. Ann. § 443.1(7)(iii)(A). Act 44 also codified the methodology announced in the June Notice, and

---

rate. That decrease amounts to the 4.878% reduction described above.

11

provided that "the revenue adjustment neutrality factor shall limit the estimated aggregate increase in the [s]tatewide day-weighted average payment rate … to the amount permitted by the funds appropriated by the General Appropriations Act for those fiscal years." *Id.* Translation: the BAF would continue to cap annual rates at the amount Pennsylvania decided it could afford to pay. On the same day, the legislature enacted the General Appropriations Act for fiscal year 2008-09, which appropriated slightly more funds for nursing facility services than had been called for in the governor's proposed budget. Soon after those enactments, DPW published another notice and request for comment regarding provider rates. 38 Pa. Bull. 3943 (July 19, 2008) (the "July Notice"). The July Notice announced that DPW had calculated proposed annual per diem rates for 2008-09, and that, "[c]ontingent on CMS approval," it would apply a BAF to those rates. *Id.*

On September 30, 2008, DPW submitted a proposed BAF for 2008-09, designated as "SPA 08-007," to CMS for approval.[8] In a brief cover letter accompanying the SPA,

---

[8] DPW actually submitted two SPAs, one regarding the rate-calculation methodology for private nursing facilities (SPA 08-007) and one regarding the calculation for public nursing facilities (SPA 08-008). In their complaint, Plaintiffs challenge both SPAs, but they raised no specific objection to SPA 08-008 in the District Court or in this appeal, and they have therefore waived any argument against it. *See McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 241 (3d Cir. 2012) ("[A]n appellant waives an argument in support of reversal if he does not raise that argument in his opening brief … ." (alteration and internal quotation marks omitted)); *United States v. Dupree*, 617 F.3d 724, 727 (3d Cir. 2010)

DPW explained that its purpose was "to authorize the continued use of the budget adjustment factor (BAF) for non-public nursing facility payment rates for the 2008-2009 rate year." (J.A. at 191.) The letter described the formula for calculating the BAF, and said that "the non-public BAF produced by this formula [for rate year 2008-09] is .90891." (J.A. at 192.) It further explained that the BAF served "to moderate the growth of nursing facility payment rates consistent with the fiscal resources of the Commonwealth, while still providing payment rate increases sufficient to assure that consumers will continue to have access to medically necessary nursing facility services." (J.A. at 191.) Finally, the letter assured CMS that Pennsylvania had "provided advance notice of its intent to amend its State Plan" by publishing public notices in the *Pennsylvania Bulletin*. (J.A. at 192.) With the cover letter, DPW submitted to CMS a SPA submittal form, a chart showing that the total cost of the state's Medicaid program was within the regulatory limits,[9] copies of the June and July Notices, and a description of the methods and standards used to calculate the per diem payment rates. That description did not explain the basis for the particular BAF proposed for 2008-09 but rather referred

(noting the "well-established proposition that arguments not raised in the district courts are waived on appeal"). In any event, Plaintiffs are all private nursing facilities and so were unaffected by the changes proposed in SPA 08-008.

[9] Federal regulations require that Medicaid payments not exceed an "upper payment limit" that is defined as "a reasonable estimate of the amount that would be paid for the services furnished" under the payment principles defined in the Act. 42 C.F.R. 447.272(b).

to Pennsylvania's statutory provisions defining the case-mix method and explained the use of BAFs generally. No other information regarding the reasons behind the new BAF, or its anticipated effect on care, was included in DPW's initial submission.

In November 2008, DPW published a public notice that included the information it had provided to CMS. 38 Pa. Bull. 6343 (Nov. 15, 2008) (the "November Notice"). The November Notice announced that, based on the amounts appropriated by the state legislature, the BAF for the 2008-09 fiscal year would be 0.90891. *Id.* That BAF was the same as stated in the SPA, but it differed from the estimate included in the June Notice because of the disparity between the governor's proposed budget and the one the legislature actually passed, which increased appropriations to nursing facilities slightly. Still, the proposed BAF represented the largest downward adjustment to the case-mix rate calculation since Pennsylvania had introduced BAFs, reducing each nursing facility's proposed per diem rate by 9.109%.[10] Application of the BAF to the 2008-09 case-mix rates meant that, on average, provider payments would be one percent higher in fiscal year 2008-09 than they had been in fiscal year

_____

[10] As described above, *see supra* note 7 and accompanying text, per diem rates calculated using the case-mix methodology are multiplied by the BAF. A case-mix rate multiplied by 0.90891 (the BAF for the 2008-09 fiscal year) will be 90.891% of its original value. In other words, application of the proposed BAF reduces the case-mix rate by 9.109%. Plaintiffs incorrectly state in their opening brief that the 2008-09 BAF "results in a reduction of 9.0891%." (Appellants' Opening Br. at 26.)

14

2007-08, due to the continuing increase in per diem rates under the case-mix methodology.[11]

Meanwhile, CMS was reviewing SPA 08-007. Keith Leuschner, the CMS employee responsible for reviewing Pennsylvania's SPAs, contacted DPW in November 2008 to clarify what effect the SPA would have on the federal dollars flowing to Pennsylvania. In particular, Leuschner was concerned because the form DPW submitted with its SPA showed negative numbers in the "federal budget impact" box for fiscal years 2008 and 2009, which suggested "that nonpublic nursing facilities would be paid less [under the amended plan] than if the state continued using the existing payment methodology." (J.A. at 180.) Leuschner asked DPW if that was the case, and the agency responded that the numbers on the form were actually incorrect, and "that

---

[11] As discussed above, rates can still increase in absolute terms from year to year, even with the application of a BAF, because of the continuing use of the case-mix methodology. The specific basis for the one percent increase in 2008-09 is not entirely clear, as the case-mix rates for the 2007-08 fiscal year are not in the record. What we do know is that: (1) the 2007-08 rates were calculated using the case-mix methodology, and were then reduced by 6.806% (using the 2007-08 BAF); (2) the 2008-09 rates were calculated using the case-mix methodology, and were then reduced by 9.109% (using the 2008-09 BAF); and (3) the 2008-09 rates resulted in payments that, overall, were one percent higher than in the previous year. The increase therefore must have been due to some component of the case-mix formula, as the change in the BAF served only to reduce the case-mix rates by a larger amount.

15

nonpublic nursing homes were going to be paid more under the proposed rate methodology for state rate-setting year 2008-2009 than they would have been paid if the existing rate structure were not changed." (J.A. at 180.) To demonstrate that assertion, DPW provided a spreadsheet, which Leuschner understood to be comparing the rates for the 2008-09 fiscal year calculated "under Pennsylvania's proposed methodology" with those "calculated in accordance with the methodology Pennsylvania had in place under the existing and (at that time approved) rate-setting method."[12] (J.A. at 181.) Leuschner "concluded that the total payments to private nursing homes were estimated to increase slightly during federal fiscal years 2008 and 2009 under the proposed SPAs," and so "recommended proceeding with approval." (J.A. at 182.) CMS made a few "pen and ink" changes to the transmittal form to correct the federal budget impact numbers (J.A. at 221), and, on December 12, 2008, it approved the SPA. In doing so, it specifically certified that the SPA conformed with the requirements of Section 13(A) and Section 30(A), and retroactively made the SPA's effective date July 1, 2008.[13]

---

[12] As discussed *infra*, Leuschner's understanding does not appear to have been accurate, as he implies that the 2008-09 rates would have been lower if the SPA were not approved. That is incorrect, because if CMS did not authorize the use of a BAF for the 2008-09 fiscal year, as requested by SPA 08-007, then the per diem rates would not have been adjusted at all. Leuschner was correct, however, that reimbursement rates would increase in absolute terms from 2007-08 to 2008-09.

[13] Regulations permit CMS in some situations to make a plan amendment retroactively effective. *See* 42 C.F.R.

In March 2009, DPW published a final public notice announcing the finalized annual per diem payment rates, after the application of the BAF, for private nursing facilities for 2008-09. 39 Pa. Bull. 1596 (Mar. 28, 2009). It then sent letters to all participating nursing facilities to notify them of their final individualized rates.

B. *Procedural History*

Following DPW's publication of the final payment rates, Plaintiffs filed timely state administrative appeals with DPW's Bureau of Hearings and Appeals (the "BHA") challenging those rates and asking that DPW "recalculate them consistent with [the] law." (Administrative Appeal, Doc. 20, Ex. A, at 14.) *See* 55 Pa. Code §§ 41.5 (giving BHA "exclusive jurisdiction over provider appeals") & 41.31 (allowing "[a] provider that is aggrieved by an agency action" to "appeal and obtain review of that action by the [BHA] by filing a request for hearing"). They claimed that DPW had violated the Medicaid Act and its own regulations by providing inadequate notice of and public process for the proposed rate changes, by retroactively setting the 2008-09 rates, and by failing to provide CMS with any information on which that agency of the federal government could base its conclusion that SPA 08-007 satisfied Section 30(A)'s requirements. In particular, Plaintiffs alleged that there was

§§ 430.20(b)(2) & 447.256(c) (permitting a state plan amendment that changes the state's payment methods and standards to become effective as early as "the first day of the calendar quarter in which an approvable amendment is submitted").

no evidence of any consideration of the SPA's effect on quality of care.

In October 2009, with those state administrative appeals pending, Plaintiffs filed the present action in the United States District Court for the Middle District of Pennsylvania, bringing claims for declaratory and injunctive relief against the Secretary of HHS, the Administrator of CMS, and the Secretary of DPW. Specifically, the complaint asserted a claim under the APA against the Federal Defendants, seeking to have HHS's approval of SPA 08-007 set aside as being contrary to law. The complaint also included a claim under the Supremacy Clause against the State Defendant, seeking to bar the application of SPA 08-007 in the determination of payment rates. Those claims were primarily based on the Federal and State Defendants' alleged violations of Section 30(A) and Section 13(A) in their development and approval of the 2008-09 state plan amendments.

Both the Federal and the State Defendants filed timely motions to dismiss Plaintiffs' claims. The Federal Defendants argued that the APA claim was barred by sovereign immunity, but the District Court disagreed, concluding that the claim fell within the scope of the waiver of federal sovereign immunity provided for in the APA.[14] It

---

[14] The APA provides a waiver of federal sovereign immunity to people "adversely affected or aggrieved by agency action within the meaning of the relevant statute," 5 U.S.C. § 702, when the agency action is made reviewable by statute or there is a final agency action "for which there is no

therefore denied the Federal Defendants' motion to dismiss. The State Defendant's motion raised three independent bases for dismissal: the abstention doctrine described in *Younger v. Harris*, 401 U.S. 37 (1971), mootness, and Eleventh Amendment sovereign immunity. The District Court granted the motion in part. It abstained from deciding the Supremacy Clause claim insofar as it related to "conduct occurring prior to CMS approval of the proposed amendments[,]" as those issues could be adequately addressed in the ongoing state administrative proceeding. *Christ the King Manor, Inc. v. Sebelius*, No. 1:09-cv-2007, at 19 (M.D. Pa. June 29, 2010) (slip op.). It also dismissed the request for declaratory relief on immunity grounds, explaining that, if it "were to issue a declaratory decree to the effect that State Defendant's implementation of the [SPA] violated federal law," the decree could have *res judicata* effect in the state administrative appeals process, which "would leave to the state system 'only a form of accounting proceeding whereby damages or restitution would be computed.'" *Id.* at 25 (quoting *Green v. Mansour*, 474 U.S. 64, 73 (1985)).) The District Court held that the case was not moot, however, and it did not dismiss Plaintiffs' claim for injunctive relief regarding the continuing application of the amended state plan.

The parties proceeded to discovery, and subsequently filed cross motions for summary judgment on the remaining claims. The District Court granted the Federal and State Defendants' motions on July 24, 2012,[15] holding that,

other adequate remedy," *id.* § 704. On appeal, the Federal Defendants do not contest that the waiver applies here.

[15] The case was stayed from March 2011 until March 2012 while the Supreme Court decided *Douglas v.*

19

"[g]iven [the] regulatory framework … and the deference afforded agency decision-making, … there is substantial evidence in the [administrative record] to support the Secretary's approval of the SPAs under [S]ection 30(A)." *Christ the King Manor, Inc. v. Sebelius*, No. 1:09-cv-2007, 2012 WL 3027543, at *8 (M.D. Pa. July 24, 2012). It further held that CMS could properly conclude that DPW had substantially complied with the public process requirements of Section 13(A). *Id.* at *15. The Court therefore found that HHS's approval of SPA 08-007 was not arbitrary or capricious, and that the State Defendant's implementation of the SPA was proper. *Id.* at *16-*17. Accordingly, it denied Plaintiffs' motion and entered judgment for the Defendants. *Id.* at *17. This timely appeal followed, in which Plaintiffs appeal both the grant of summary judgment and the earlier partial dismissal of Plaintiffs' claim against the State Defendant.

## II. Discussion[16]

On appeal, Plaintiffs ask that we reverse the District Court's orders and enter judgment in their favor on all counts. They repeat their contention that HHS's approval of SPA 08-

*Independent Living Center of Southern California*, 132 S. Ct. 1204 (2012), a case discussed *infra* that arose from California's cuts to Medicaid reimbursement rates.

[16] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706. We have jurisdiction pursuant to 28 U.S.C. § 1291.

007,[17] as well as DPW's implementation of it, violates federal law, specifically Sections 30(A) and 13(A) of the Medicaid Act. They also argue that their claim against the State Defendant can be addressed in this proceeding and should be resolved in their favor. This appeal therefore presents two distinct issues: first, whether the Federal Defendants' approval of SPA 08-007 was proper under the APA, and, second, what relief, if any, Plaintiffs can obtain from the State Defendant in this suit.

### A. *APA Claim Against the Federal Defendants*

Plaintiffs argue that HHS's approval of SPA 08-007 was improper for two reasons.[18] First, they say that there was

---

[17] For simplicity, we will generally refer to "HHS" or "the Secretary" when discussing the SPA approval process. We recognize that CMS conducted the approval process and exercised delegated authority in approving SPA 08-007.

[18] Although SPA 08-007 only defined nursing facilities' reimbursement rates for the 2008-09 fiscal year, no party contends that Plaintiffs' challenge to HHS's approval decision is moot. Nonetheless, we have an independent obligation to determine whether Plaintiffs' claim presents a justiciable case or controversy. *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007). "[A] case will be considered moot, and therefore nonjusticiable as involving no case or controversy, if the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *In re Surrick*, 338 F.3d 224, 229 (3d Cir. 2003) (quoting *In re Kulp Foundry, Inc.*, 691 F.2d 1125, 1128 (3d Cir. 1982)) (internal quotation marks omitted). We conclude that Plaintiffs' claim against the Federal Defendants is not moot.

insufficient evidence in the administrative record to support any conclusion that the SPA satisfies Section 30(A) of the Medicaid Act. Discussed in more depth below, that provision requires that a state plan provide "methods and procedures" necessary to "assure" that payments to providers are "consistent with" efficiency, economy, quality of care, and adequate access to providers. 42 U.S.C. § 1396a(a)(30)(A). Plaintiffs note that SPA 08-007 categorically reduced – by more than nine percent – the per diem payments which are called for by the state's own case-mix calculation, and which

Although SPA 08-007 will not define their reimbursement rates in the future, nursing facilities continue to believe that the HHS's decision to approve the SPA violated federal law, and that they are entitled to reimbursement rates for 2008-09 that are calculated in accordance with a properly approved state plan. This appeal provides an opportunity for them to obtain some measure of relief, since, if the agency's action was arbitrary or capricious under the APA, we must set that action aside and require the agency to conform its action to federal law. 5 U.S.C. § 706(2)(A) ("The reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … ."); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that, "[i]f the record before the agency does not support the agency action, … the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"). Plaintiffs therefore have an interest in the outcome of this appeal "that is real and not hypothetical," and their claim against the Federal Defendants provides an "occasion for meaningful relief." *Rendell*, 484 F.3d at 240 (internal quotation marks omitted).

are represented by the state as reflecting what is "necessary and reasonable for an efficiently and economically operated nursing facility to provide services to [Medicaid] residents." 55 Pa. Code § 1187.2. They say that the arbitrary reduction imposed by the SPA threatens the quality of care provided to Medicaid recipients, yet the administrative record is "silent" as to the Defendants' "consideration of the quality of care factor." (Appellants' Opening Br. at 45.) Therefore, they contend, HHS improperly concluded that the amended state plan satisfies Section 30(A). Plaintiffs' second contention is that HHS erred in concluding that DPW had satisfied the public process requirements of Section 13(A). More particularly, they say that the only public notice published before the SPA's effective date failed to comply with federal regulations regarding the content of such notices.

The District Court rejected both lines of argument. According significant deference to HHS's interpretations of the Medicaid Act, the Court held that the record was sufficient to support the Secretary's approval of the SPA. *Christ the King Manor*, 2012 WL 3027543, at *8-*9. For the reasons elaborated herein, we disagree in part. Although we agree with the District Court that we must defer to HHS's reasonable interpretations of the Medicaid Act, and that DPW satisfied the public process requirements of Section 13(A), we part ways when it comes to the District Court's decision that HHS could properly conclude on the evidence before it that SPA 08-007 complies with Section 30(A). Our conclusion is, to the contrary, that HHS's approval of the SPA was arbitrary and capricious, and must be set aside.

### 1. *Standard of Review*

"We apply *de novo* review to a district court's grant of summary judgment in a case brought under the APA, and in turn apply the applicable standard of review to the underlying agency decision." *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 146 (3d Cir. 2012) (internal quotation marks omitted). Section 706 of the APA governs our review of the agency action. *CBS Corp. v. FCC*, 663 F.3d 122, 137 (3d Cir. 2011). It provides that we shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that restricted standard of review, we must consider whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," while being careful "not to substitute [our own] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 389-90 (3d Cir. 2004) ("[W]e must ensure that, in reaching its decision, the agency examined the relevant data and articulated a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 F.3d at 43)). An agency action may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

In determining whether any of those circumstances exist, we are conscious of our responsibility to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974) (internal quotation marks omitted)). Nevertheless, we should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotation marks omitted). Our review must also be based on "the administrative record [that was] already in existence" before the agency, not "some new record made initially in the reviewing court" or "post-hoc rationalizations" made after the disputed action. *Rite Aid of Pa., Inc. v. Houstoun*, 171 F.3d 842, 851 (3d Cir. 1999) (internal quotation marks omitted).

The agency action at issue here is HHS's approval of Pennsylvania's SPA 08-007, which Plaintiffs argue was arbitrary and capricious because there was insufficient evidence in the administrative record that, as required by Section 30(A), DPW had considered the SPA's impact on quality of care, or that it had followed the public process requirements of Section 13(A). In so arguing, Plaintiffs implicitly take issue with HHS's interpretation of the Medicaid Act. By approving SPA 08-007, HHS evidently concluded that Pennsylvania's amended state plan satisfies the requirements of Sections 30(A) and 13(A) of the Act. *See* 42 U.S.C. § 1316(a)(1) (requiring the Secretary to "make a determination as to whether [the submitted plan] conforms to the requirements for approval"). To reach that conclusion, the agency had to determine what those requirements entail, which involves interpreting the relevant provisions. Therefore, we must establish at the outset whether to accord *Chevron* deference to agency interpretations of the Medicaid

Act inherent in HHS approval of a state plan amendment.[19] *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984) (barring a court from "substitut[ing] its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").

Under the Supreme Court's decision in *United States v. Mead Corp.*, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226-27 (2001). As the United States Court of Appeals for the Ninth Circuit recently explained, the Supreme Court "[a]rguably … has already concluded that SPA approvals meet" that standard, and thus are entitled to *Chevron* deference. *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1246 (9th Cir. 2013). In *Douglas v. Independent Living Center of Southern California, Inc.*, the Supreme Court said that "[t]he Medicaid Act commits to the federal agency the power to administer a federal program," and that, in approving a SPA, "the agency

---

[19] We have previously held that *Chevron* deference applies to HHS's interpretations of the Medicaid Act in the context of a challenge to a state plan amendment, but only in a case that was decided before the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218 (2001), which limited that deference to certain types of agency action. *See Erie Cnty. Geriatric Ctr. v. Sullivan*, 952 F.2d 71, 77 (3d Cir. 1991) (granting "substantial deference" to the Secretary's interpretations of the Act).

has acted under [that] grant of authority." 132 S. Ct. 1204, 1210 (2012). The *Douglas* Court noted that the agency's approval "carries weight," especially when "the language of the particular provision at issue … is broad and general, suggesting that the agency's expertise is relevant in determining its application." *Id.* Although the Court stopped short of explicitly holding that the *Chevron* framework applies to SPA approvals, those statements in *dicta* strongly suggest as much, and we "do not view them lightly." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007) (alteration and internal quotation marks omitted); *see also id.* ("To ignore what we perceive as persuasive statements by the Supreme Court is to place our rulings … in peril.").

In addition to that suggestion from the Supreme Court, some of our sister circuits have held that SPA approvals are the type of agency action entitled to *Chevron* deference under *Mead*, and no circuit court precedent holds to the contrary. In *Managed Pharmacy Care*, for example, the Ninth Circuit concluded that "Congress explicitly granted the Secretary authority to determine whether a State's Medicaid plan complies with federal law," and that "[i]t is well within the Secretary's mandate to interpret the statute via case-by-case SPA adjudication." 716 F.3d at 1249. Similarly, the D.C. Circuit has held that, through express delegation of interpretive authority, "Congress manifested its intent that the Secretary's determinations, based on interpretation of the relevant statutory provisions, should have the force of law." *Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004). In short, the reasoning goes, the *Chevron* framework applies to SPA approvals. *Id.* at 821; *see also Managed Pharmacy Care*, 716 F.3d at 1248 ("*Chevron* applies to SPA approvals … ."); *Harris v. Olszewski*, 442

27

F.3d 456, 467 (6th Cir. 2006) ("[T]he agency's approval of the state plan amendment is entitled to *Chevron* deference.").

We agree. The Medicaid Act expressly states that the Secretary must "approve any plan which fulfills the conditions specified" in the statute. 42 U.S.C. § 1396a(b). Through that provision, Congress delegated to the agency the responsibility to make interpretive decisions regarding which state plans satisfy the Act's requirements. Those decisions carry the force of law, as HHS is prohibited from making payments to states whose plans do not comply with the Act, 42 U.S.C. § 1396c,[20] and the state must pay for Medicaid services "using rates determined in accordance with methods and standards specified in an approved State plan," 42 C.F.R. 447.253(i). *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-81 (2005) (applying the *Chevron* framework because a statute gave an agency "the authority to promulgate binding legal rules" (citing *Mead*, 533 U.S. at 231-34)). SPA approvals are therefore the type of agency action that warrants *Chevron* deference under *Mead*.

---

[20] Section 1396c was held unconstitutional in certain respects, not applicable here, in *National Federation of Independent Businesses v. Sebelius*. 132 S. Ct. 2566, 2607 (2012) (holding that HHS "cannot apply § 1396c to withdraw existing Medicaid funds for failure to comply with the requirements set out in the [Medicaid] expansion" provided for in the Patient Protection and Affordable Care Act, 124 Stat. 119).

With that in mind, we turn to HHS's approval of SPA 08-007, given the strictures of Section 30(A) and Section 13(A).

### 2.  *Compliance with Section 30(A)*

Section 30(A) requires that a state Medicaid plan:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan … as may be necessary to safeguard against unnecessary utilization of such care and services and *to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan* at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A) (emphasis added).  Put more simply, it mandates that a state plan include "methods and procedures" that "assure that payments to providers produce four outcomes: (1) 'efficiency,' (2) 'economy,' (3) 'quality of care,' and (4) adequate access to providers by Medicaid beneficiaries."  *Pa. Pharmacists Ass'n*, 283 F.3d at 537 (quoting 42 U.S.C. § 1396a(a)(30)(A)).  Section 30(A) is one of the statutory prerequisites a state plan must satisfy to receive federal approval, and thus federal funding.  *See* 42 U.S.C. § 1396a(a) (defining the requirements that a state plan "must" satisfy); *id.* § 1396a(b) ("The Secretary shall approve

29

any plan which fulfills the conditions specified in subsection (a) of this section … .").

We have considered Section 30(A)'s requirements on two previous occasions.  In *Rite Aid of Pennsylvania v. Houstoun*, we held that it mandates "substantive compliance" with the four specified factors, but it "does not impose any particular method or process for getting *to* that result."  171 F.3d at 851.  Rather, in contrast to an earlier and now-repealed provision of the Medicaid Act known as the "Boren Amendment," which "specifically requir[ed] that states take into account certain findings" and make particular assurances,[21] Section 30(A) leaves it "up to a state how it will

---

[21]  The Boren Amendment required that a state pay providers using rates that "the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards … ."  42 U.S.C. § 1396a(a)(13)(A) (1994).  The Boren Amendment was interpreted to impose both procedural and substantive requirements on states in setting reimbursement rates, and to be enforceable in a private right of action under 42 U.S.C. § 1983.  *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 524 (1990) ("The Boren Amendment … creates a right, enforceable in a private cause of action pursuant to § 1983, to have the State adopt rates that it finds are reasonable and adequate rates to meet the costs of an efficient and economical health care provider.").  The Amendment was repealed in 1997, after substantial lobbying

'assure' the [required] outcomes." *Id.* at 852. Nonetheless, we said that the state's "process of decision-making" in setting a rate methodology must be "reasonable and sound," *id.* at 853, and "budgetary considerations may not be the sole basis for a rate revision," *id.* at 856. In *Pennsylvania Pharmacists Association v. Houstoun*, we again interpreted Section 30(A), this time for the purpose of determining whether it granted Medicaid providers a cause of action under 42 U.S.C. § 1983. 283 F.3d at 534-35. In holding that it does not, we explained that "Section 30(A), unlike the Boren Amendment, does not demand that payments be set at levels that are sufficient to cover provider costs," but instead requires that they be "sufficient to meet recipients' needs."[22] *Id.* at 538. Therefore, under this Court's existing jurisprudence, Section 30(A) allows states to set a rate methodology using any process that is reasonable, considers more than simply budgetary factors, and results in payments that are sufficient to meet recipients' needs.

But while those prior interpretations help guide our analysis, they do not necessarily control the outcome here. Under *Chevron*, if HHS applied a different but nonetheless permissible interpretation of Section 30(A), then we must

efforts by states seeking greater latitude in setting their rates. *Pa. Pharmacists Ass'n*, 283 F.3d at 536, 539 & n.12.

[22] Of course, the law of supply and demand does not disappear, no matter how much one might wish it would, so a focus on recipients that gives no thought to provider costs will soon leave ample demand from needy recipients and no providers to supply services. Setting payment levels to meet recipients' needs must therefore inevitably take into account provider costs.

defer to that interpretation, even if it conflicts with our precedent. As the Supreme Court has made clear, a judicial precedent cannot displace a conflicting agency construction unless the statute "unambiguously forecloses the agency's interpretation." *See Brand X*, 545 U.S. at 982-83. The question before us is therefore whether HHS's approval of SPA 08-007 was based on a permissible construction of Section 30(A), not whether the SPA satisfies our prior interpretation of the statute. *Cf. Managed Pharmacy Care*, 716 F.3d at 1246-50 (deferring to HHS's interpretation of Section 30(A) instead of applying the court's prior interpretation of that provision).

To answer that question, we must consider the basis HHS had for concluding that Section 30(A) is satisfied, which requires that we examine the record it had before it during the SPA approval process. *Rite Aid*, 171 F.3d at 851 ("[I]n reviewing section 30(A) issues a court must confine itself to the agency's administrative record … ."). That record is remarkably thin, especially when compared to the administrative records developed in other Section 30(A) challenges. In *Rite Aid*, for example, the state amended reimbursement rates to pharmacies after conducting cost studies of pharmacy pricing data, considering input from interested parties, seeking additional data on the reimbursement rates of third-party payors, and comparing Pennsylvania's rates to the rates in neighboring states. *Id.* at 848; *see also, e.g.*, *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 52 (1st Cir. 2004) (noting that the state agency revised rates after it "held hearings … and sought data from Massachusetts pharmacies as to their costs of acquisition of individual drugs"). Here, on the other hand, there is no indication in the record as to how Pennsylvania

settled on the particular rate-calculation methodology proposed in SPA 08-007. Although DPW explained that the 2008-09 BAF was intended to limit payments to the amount appropriated by the state legislature, that explanation is the same as the one offered for BAFs overall. It reveals nothing about how the particular BAF proposed in SPA 08-007 – which differed from the ones imposed in years past and required independent approval – was selected, other than that it was based on legislative appropriations for that fiscal year. Absent information on how the appropriated amount was determined, or a reasoned explanation for why that amount allows for rates that are "consistent with" efficiency, economy, quality of care, and adequate access, DPW's description of the BAF methodology provides no insight into whether the SPA complies with Section 30(A). The state gave no such information, and HHS did not request any. There are no studies or analyses of any kind in the record, and the only "data" DPW provided was a spreadsheet comparing rates under the proposed SPA with those paid the previous year. HHS therefore had to base its approval decision solely on the proposed methodology itself, a comparison to the previous year's rates, and DPW's unsupported assertion that the new BAF would permit "payment rate increases sufficient to assure that consumers will continue to have access to medically necessary nursing facility services." (J.A. at 191.)

Notwithstanding the sparseness of the administrative record, the Federal Defendants argue that it supports the Secretary's approval of SPA 08-007. Specifically, they say that HHS could properly conclude that the SPA satisfies Section 30(A) for three reasons: first, payments to nursing facilities increased slightly from the previous fiscal year under the proposed SPA, second, Pennsylvania had

previously employed BAFs without harming quality of care, and, third, other statutory provisions independently assure that Medicaid recipients will receive quality care. The Federal Defendants focus particularly on the overall increase in payments, emphasizing that "the budget adjustment factor did not cut payment rates in absolute terms, but rather served to moderate the rate of increase in provider payments under the case-mix system and thereby avoid an unsustainable pace of inflation." (U.S. Br. at 19.)

But while that assertion is undisputed, and reducing unsustainable inflation is certainly a laudable and entirely legitimate state objective, the small absolute increase in payments from 2007 to 2008 reveals practically nothing about SPA 08-007's compliance with Section 30(A). As the Federal Defendants acknowledge, that increase is due to the application of the case-mix methodology, which has been in place since 1996. An essential premise of their argument seems to be that the case-mix method results in payments that are unduly high, and that do not in fact reflect the "necessary" costs of providing care to Medicaid recipients. That may be the case, but there is no evidence of it anywhere in the record, and DPW never suggests that the state's underlying methodology is flawed. Rather, the state repeatedly explains that it must reduce the case-mix rates for budgetary reasons, not because they are based on a rate-calculation methodology that overcompensates providers.

The case-mix method sets per diem rates for each nursing facility by considering, among other things, the projected acuity level of Medicaid recipients and the costs "which are necessary and reasonable for an efficiently and economically operated nursing facility to provide services" to

34

those patients. 55 Pa. Code § 1187.2. In other words, it determines payments by considering the costs of providing care to Medicaid recipients, which means that the increase in payment rates is due, at least in part, to increasing costs. The contested SPA does not change that aspect of the rate calculation methodology; it just adds one last step: using a BAF to reduce the final per diem rates. The overall increase in payments therefore tells us nothing about the SPA's effect on quality of care; it just shows that the cost of caring for Medicaid recipients – as determined under the case-mix methodology – continues to go up.

To demonstrate that point, we need only look to DPW's proposed rate revisions for 2005. The BAF initially proposed for the 2005-06 fiscal year would have allowed rates to increase two percent from the previous year – twice the increase allowed by the 2008-09 BAF. After interested parties raised numerous criticisms about the proposed change, the legislature appropriated additional funds and the BAF was revised to allow for a 2.8% increase in rates. 35 Pa. Bull. 6233 (Nov. 12, 2005). DPW explained that the adjustment in the cap addressed quality of care concerns, and thus DPW effectively acknowledged that rates can increase in absolute terms while still being inadequate to meet recipients' needs. *Id.* at 6233-34.

In reviewing SPA 08-007, however, HHS not only treated the absolute increase as sufficient assurance of quality of care; it also seemed to misunderstand the SPA's effect on Pennsylvania's rate calculation methodology. Based on a spreadsheet showing the one percent increase in payments from the previous year, the CMS employee responsible for reviewing the SPA concluded that rates would be higher

under the SPA than they would have been "if the existing rate structure were not changed," in effect concluding that the SPA was responsible for the rate increase. (J.A. at 180.) But that cannot be the case, as the only change proposed in the SPA was the use of a BAF that more substantially reduced the case-mix rates than in any previous year. *See supra* note 12. Moreover, under the previously approved state plan, BAFs were authorized only through 2008, meaning that the approved rate-calculation method did not involve the use of *any* BAF for the 2008-09 fiscal year. Rates were therefore projected to increase in 2008-09 despite the proposed SPA, not because of it.

Pennsylvania's previous use of BAFs also provides no assurance that payments under SPA 08-007 would be consistent with quality of care. According to the Federal Defendants, because Pennsylvania had "already employed a budget adjustment factor in three previous fiscal years" (U.S. Br. at 19) without causing "any apparent issues with quality of care or beneficiary access to services" (*id.* at 20), HHS could reasonably conclude that SPA 08-007 "was likewise compliant with Section 30(A)" (*id.*). They emphasize that, even with ongoing monitoring activities, HHS had not been made "aware of any complaints by beneficiaries or nursing facilities … about payments made pursuant to the BAF system." (*Id.*) They further note that federal regulations permit HHS to approve a state plan amendment "on the basis of policy statements and precedents previously approved" by the agency. 42 C.F.R. § 430.15(b). Therefore, they argue, HHS could reasonably conclude that the proposed amendment, which "employed a substantially similar methodology" to the one taken the previous three years, "was likewise compliant with Section 30(A)." (U.S. Br. at 20.)

36

The obvious flaw in that argument is that earlier adjustments do not reveal how a later and different adjustment may change a system already affected by the earlier adjustments. The fifth blow to a boxer's chin may be no more forceful than the previous four, but still be forceful enough to shatter a weakened jaw. And if the fifth blow is more forceful, a "no worries" mindset is even less warranted. The 2008-09 fiscal year's adjustment of 9.109% is not necessarily the same in its impact as the 6.806% adjustment that was proposed for 2007-08.

The Federal Defendants portray the continued use of BAFs generally as the key change proposed by SPA 08-007, and they treat BAFs as simply another variable in the case-mix methodology. Just as provider costs and resident acuity vary year to year under the approved rate-calculation formula, so too does the BAF, they imply. But a BAF is not simply a variable in an approved formula; each new BAF effectively establishes a new formula by which final rates are calculated, and hence is a "[m]aterial change[]" to the state's plan that requires its own approval. *See* 42 C.F.R. § 430.12(c)(1)(ii) (requiring a state to amend its plan when necessary to reflect "[m]aterial changes … in the State's operation of the Medicaid program"). Depending on what the state legislature decides, a BAF could cut per diem rates by less than five percent, as it did in 2005, or by nine percent, as SPA 08-007 proposed, or potentially by even more. Yet under the Federal Defendants' reasoning, the use of any BAF, regardless of its size, could be justified by the fact that a previous, smaller adjustment to the cost-based rate proved acceptable. That conclusion is unsupported and unsupportable. A BAF is – at base – simply a budget-based cut to provider payments, and

37

the size of that cut matters to Medicaid recipients and providers. Although it may be possible to decrease payments by nine percent, as SPA 08-007 does, and not affect quality of care, it is also very possible that care will be significantly and negatively affected, and the success of earlier cuts does not suggest otherwise. It is simply not reasonable to conclude that, because prior cuts did not seem too painful, a deeper cut would not hurt.

That leaves "independent statutory assurances" as the only basis, beyond DPW's bare assertion that consumers will still have access to Medicaid services, upon which HHS could conclude that the rate-calculation methodology of SPA 08-007 will produce payments that are consistent with quality of care. It is true, as the Federal Defendants note, that we have previously considered it reasonable for a state "to rely upon laws or regulations which independently ensure quality care" when setting payment rates under Section 30(A). *Rite Aid*, 171 F.3d at 855. Seizing upon that statement, the Federal Defendants describe provisions of the Nursing Home Reform Act, 42 U.S.C. §§ 1395i-3, 1396, that allow for "oversight and inspection of nursing facilities" and "require[] certification that participating facilities satisfy certain 'quality of care' standards." (U.S. Br. at 21 (citing those provisions).) They also note that in 2005 Pennsylvania instructed nursing facilities that they have an obligation "to provide appropriate, high-quality care" that "exists independent of any particular payment rate or any features of the rate-setting methodology." (*Id.* (quoting 35 Pa. Bull. 6232 (Nov. 12, 2005)) (internal quotation marks omitted).) Based on our holding in *Rite Aid*, the Federal Defendants contend that HHS could have reasonably relied upon such "independent assurances of quality of care" when it approved SPA 08-007.

38

Those assurances cannot be the sole basis for a rate revision, however, or Section 30(A)'s quality of care component – and HHS's review of that component – would be rendered meaningless. In *Rite Aid*, independent statutory assurances were but one feature of an ample record. *See* 171 F.3d at 848 (describing the studies conducted). We never suggested that, as long as states declare their insistence on quality care under other statutory provisions, reimbursement rates will be deemed to satisfy Section 30(A). Such an interpretation of Section 30(A) not only defies its plain language and nullifies HHS's review process under that provision, *see Erie Cnty. Geriatic Ctr. v. Sullivan*, 952 F.2d 71, 78 (3d Cir. 1991) (declining to interpret the Medicaid Act in a manner that renders HHS review "hardly more than ministerial"), it also ignores fiscal realities by implying that a state can continue to assure quality of care by holding nursing homes to high standards while simultaneously underfunding them. In short, simply passing a statute saying that nursing homes will provide quality care does not make it so. Section 30(A) cannot reasonably be interpreted to mean that once a state has declared its commitment to quality of care, it need not consider that factor in setting its reimbursement rates.

Nor is a state's unsupported assertion that its plan meets Section 30(A)'s requirements, without any accompanying explanation or evidence, a sufficient basis to support HHS approval. In approving a state plan, HHS must be able to conclude that the plan "provide[s] such methods and procedures … as may be necessary … to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). It is true that Section 30(A) grants states considerable latitude in selecting a

39

method for calculating reimbursement rates, and that it "does not impose any particular method or process" for meeting its substantive requirements. *Rite Aid*, 171 F.3d at 851. But that latitude is not limitless. The reimbursement rates that states select affect the funding they are entitled to receive from the federal government, and material changes to those rates are thus subject to federal approval. Section 30(A) gives teeth to the approval process, allowing HHS to reject state plans that provide inadequate assurance that payments will be consistent with efficiency, economy, quality of care, and adequate access. *See* 42 C.F.R. § 430.15(c)(1) (providing that CMS, with HHS's approval, "retains authority for determining that proposed plan material is not approvable or that previously approved material no longer meets the requirements for approval"). And HHS has done so before, denying approval to state plan amendments when states "provide[] no … data to substantiate [their] proposed rates," *Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 937 (9th Cir. 2005), or when they provide "unsupported assertions" of compliance with Section 30(A), *Minnesota v. Ctrs. for Medicare & Medicaid Servs.*, 495 F.3d 991, 996 (8th Cir. 2007) (internal quotation marks omitted).

If we were to hold that DPW's bare assertion is sufficient to satisfy Section 30(A), we would make that provision a dead letter. The Medicaid Act requires that HHS "approve any plan which fulfills the conditions" imposed on state plans. 42 U.S.C. § 1396a(b). Therefore, in order for HHS to deny approval on Section 30(A) grounds, a plan must fail to fulfill its conditions. If a state could satisfy those conditions simply by asserting that it has done so, then HHS would lack the authority to disapprove a plan due to a state's lack of data or its "unsupported assertions." No court has

countenanced such an impotence-inducing interpretation of Section 30(A). On the contrary, in holding that Section 30(A) confers no private right of action against the state under 42 U.S.C. § 1983, courts have repeatedly assured Medicaid providers and recipients that the quality of care and access requirements will not "go unenforced" because "HHS [is] responsible for ensuring that state plans are administered in accordance with these requirements." *Pa. Pharmacists Ass'n*, 283 F.3d at 543-44; *see also Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 56 (1st Cir. 2004) ("Of course, the Secretary of HHS … can enforce compliance with [Section 30(A)] and implementing regulations … by disapproving a state plan … ."). There is no suggestion in the text, its accompanying regulations, or the legislative history that HHS's oversight role in enforcing Section 30(A)'s requirements involves simply accepting a state's assertions at face value. *See* 42 U.S.C. § 1396a(b) (requiring the Secretary to approve plans that "fulfill[] the conditions specified in subsection (a)," which include Section 30(A)); 42 C.F.R. § 430.12(c) (requiring "[p]rompt submittal of amendments … [s]o that CMS can determine whether the plan continues to meet the requirements for approval"); 146 Cong. Rec. H11682-02 (explaining that, even with the repeal of the Boren Amendment, the Medicaid Act ensures through Section 30(A) that states "provide adequate reimbursement"). Therefore, to the extent that HHS's approval of a SPA rests on such an interpretation, it is not a "permissible construction of the statute" entitled to deference under *Chevron*. 467 U.S. at 842-43.[23]

---

[23] Before the District Court, the Federal Defendants argued that HHS "was required to more rigorously scrutinize a proposed amendment only when [the state's] assurances

41

were questionable on their face." *Christ the King Manor*, 2012 WL 3027543, at \*6. Although the Federal Defendants do not repeat that argument on appeal, we take a moment to address it here, as the District Court seems to have found it convincing. *See id.* at \*8-\*9 (agreeing with the Federal Defendants' interpretation of the state's obligations under Section 30(A)); *see also id.* at \*14 (concluding that "it was within CMS's expertise to determine whether DPW's representations concerning approval of the SPAs, which mirrored those approved in the past, complied with section 30(A)"). HHS may choose not to exercise the same rigor in scrutinizing all state plan amendments. But it must actually scrutinize them, at least to the extent necessary to "make a determination as to whether [the amendment] conforms to the requirements for approval." 42 U.S.C. § 1316(a)(1). Furthermore, we reject the notion that, as a threshold matter, we must determine whether a SPA is facially questionable before reviewing the agency's action. Such an approach would require a reviewing court to make its own assessment of whether a proposed change should have raised red flags regarding quality of care, a task which is for HHS and which we are ill-equipped to perform. Here, for example, the Federal Defendants indicate that a 9.109% reduction is nothing to worry about, but, absent information justifying that assertion, a court has no way to know if such a reduction should have caused HHS to take a closer look. The BAF proposed in SPA 08-007 could have reduced rates by 5%, 10%, 15%, or something even greater, and presumably the Federal Defendants would agree that, at some point, it would be arbitrary and capricious for HHS to approve the SPA based solely on soothing words from the state. For that reason, the burden is on the agency, not on the reviewing

42

Of course, as the Federal Defendants rightly note, there is a bit more in the record in this case than the state's assertion that SPA 08-007 would "still provid[e] payment rate increases sufficient to assure that consumers will continue to have access to medically necessary nursing facility services." (J.A. at 191.) There is also "data," in the form of the spreadsheet DPW submitted at HHS's request, "showing that payments to nonpublic nursing facilities would increase" from the prior fiscal year. (U.S. Br. at 23.) But, as described above, that increase does not, by itself, tell us or HHS anything about the SPA's effect on quality of care or access to providers.[24] So far as the record shows, Pennsylvania decided to reduce its cost-based per diem rates to the amount that it could afford to pay, without taking any steps to ensure that payments would still be consistent with quality of care and adequate access. In approving that decision, HHS seems to have "entirely failed to consider" those "important

court, to supply a reasoned basis for its action. *See State Farm*, 463 U.S. at 43.

[24] Although Plaintiffs focus their argument on the "quality of care" factor, we note that "quality of care" and "adequate access to providers" are related concepts, and that budget cuts have the capacity to affect both components of Section 30(A). If, for example, a state reduces its payments to significantly below the amount necessary for a nursing facility to treat its patients, some facilities might cut corners and provide inadequate care, whereas others might stop accepting Medicaid patients altogether and thus restrict access to providers. *See Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1498 (9th Cir. 1997) (discussing the possible effects of payment reductions on access to providers).

43

aspect[s]" of Section 30(A). *See State Farm*, 463 U.S. at 43. Indeed, the record suggests that the agency misunderstood the proposed changes and blessed the SPA based solely on the absolute increase in payments from the previous year. There is no indication that the agency "examine[d] the relevant data," nor did it "articulate a satisfactory explanation for its action." *Id.* Therefore, because we cannot discern from the record a reasoned basis for the agency's decision, we conclude that its approval of SPA 08-007 was arbitrary and capricious under the APA.

In so holding, we do not imply that the payments Pennsylvania made to providers during the 2008-09 fiscal year were in fact inconsistent with any of Section 30(A)'s requirements. It is possible that the state was able to adjust the per diem rates by nine percent while maintaining quality care and ensuring adequate access to providers. But it is also possible that the state's nine percent adjustment threatened to harm care to Medicaid recipients in ways that previous, smaller adjustments had not. The problem here is that, at least so far as the record shows, HHS did not actually determine which scenario it confronted, and thus we are obligated to set its approval decision aside. 5 U.S.C. § 706(2) (requiring courts to "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").[25]

---

[25] That does not mean that Plaintiffs will necessarily be entitled to a rate recalculation, and we in no way suggest that they should have been paid in accordance with the previously approved state plan, which did not involve the use of any BAF for the 2008-09 fiscal year. When, as here, "the record before the agency does not support the agency action," the

44

### 3.    *Compliance with Section 13(A)*

Plaintiffs also contend that HHS's approval of SPA 08-007 was arbitrary and capricious because the state failed to comply with the public process requirements of Section 13(A) and its accompanying regulations. They say that, although DPW provided numerous public notices of its proposed changes, only the June Notice was published before the SPA's effective date, and it inadequately described the new rate methodology and did not include certain details required by federal regulations. Specifically, they complain that the Notice was published only two days before the SPA's proposed effective date, did not include the specific BAF ultimately adopted, failed to provide an estimate of the expected increase or decrease in aggregate expenditures, and did not identify any local agencies where copies of the proposed changes would be available for public review. Because of those alleged deficiencies, they argue that HHS could not have lawfully accepted DPW's assurance that Pennsylvania had "provided advance notice of its intent to amend its State Plan." (J.A. at 192.)

---

agency may be afforded an opportunity "for additional investigation or explanation," upon which the agency could lawfully base its action. *Fla. Power & Light Co.*, 470 U.S. at 744. *Cf.* 42 U.S.C. § 1316(a)(4) (providing that, when a court of appeals reviews a state's appeal of an agency decision regarding a state plan, the court "may remand the case to the Secretary to take further evidence, and [she] may thereupon make new or modified findings of fact and may modify [her] previous action").

Section 13(A) of the Medicaid Act requires that states seeking to change their rate-setting methodologies provide a public process under which:

> (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,

> (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications, [and]

> (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published … .

42 U.S.C. § 1396a(a)(13)(A). In other words, a state must provide notice of "proposed rates together with the methodologies and justifications used to establish those rates," and give "concerned state residents … a reasonable opportunity" to review and comment on them. *Children's Seashore House v. Waldman*, 197 F.3d 654, 659 (3d Cir. 1999). Federal regulations provide further guidance on the substantive requirements of that notice. Under 42 C.F.R. § 447.205, notice of a "significant proposed change" in a state's rate-setting methodology must "[d]escribe the proposed change in methods and standards," "[g]ive an estimate of any expected increase or decrease in annual aggregate expenditures," "[e]xplain why the agency is

46

changing its methods and standards," and "[i]dentify a local agency … where copies of the proposed changes are available for public review." 42 C.F.R. § 447.205(a), (c). Section 447.205 also provides that the notice must "[b]e published before the proposed effective date of the change." *Id.* § 447.205(d)(1). Those notice requirements must be satisfied in order for a state plan amendment to receive approval. *Id.* § 447.253(h).

Our review of the state's compliance with Section 13(A) is circumscribed by HHS's decision to approve the SPA. As the Ninth Circuit has explained, "[o]ur duty is not to determine for ourselves whether the State's notice sufficiently complied with the statute and regulations; that duty is imposed on the Secretary." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251-52 (9th Cir. 2000). We must instead consider, as we did with Section 30(A), "whether the Secretary acted arbitrarily or capriciously when she accepted the State's assurance of notice as satisfactory to her." *Id.* at 1252. In doing so, we accord deference to the Secretary's reasonable interpretations of Section 13(A), *see supra* Section II.A.1, and we must give controlling weight to her interpretations of her own regulations unless they are inconsistent with the regulation or plainly erroneous. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Under that standard, we cannot say that it was arbitrary or capricious for HHS to accept DPW's assurance that it had provided adequate notice of the proposed changes to its rate-calculation methodology. Section 13(A) speaks very generally, requiring simply that the state provide notice and a "reasonable opportunity" for comment on proposed rate revisions. 42 U.S.C. § 1396a(a)(13)(A). The June Notice did

47

so, as it put providers and beneficiaries on notice of the estimated BAF for 2008-09, informed them as to how and why the BAF would be determined, and provided thirty days for submission of comments. *See Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 920 (5th Cir. 2000) (holding that a state satisfied Section 13(A)'s notice requirements because its notices "outlined the substance of the plan in sufficient detail to allow interested parties to decide how and whether to seek more information on the plan's particular aspects" (internal quotation marks omitted)), *abrogation on other grounds recognized by Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 704 (5th Cir. 2007). Although the Notice was published just days before the SPA's requested effective date of July 1, 2008, the new rates were not actually implemented on that date; rather the SPA was made retroactively effective when it was approved in December 2008. Interested parties therefore had ample opportunity to review and comment on the proposed changes before they were finalized.[26] Furthermore, although the BAF described in the June Notice differed slightly from the one submitted in the SPA, the revised BAF was, on its face, more favorable to nursing facilities. HHS could therefore have reasonably concluded that the June Notice "outlined the substance" of the new rate calculation methodology "in sufficient detail" to alert nursing facilities to the scope and nature of the proposed change. *Evergreen*, 235 F.3d at 920.

That DPW may have failed to literally comply with federal regulations regarding public notice does not make

---

[26] Notably, Plaintiffs do not contend that they lacked actual notice of the proposed changes, or that they were denied adequate opportunity to comment on the new BAF.

48

HHS's acceptance of its assurances arbitrary or capricious. According to Plaintiffs, the June Notice violated 42 C.F.R. § 447.205(c) by not providing a numeric estimate of the "expected increase or decrease in annual aggregate expenditures," and by not identifying any county offices where copies of the Notice would be available for public review. (Appellants' Opening Br. at 59.) Plaintiffs do not dispute, however, that the estimated BAF included in the Notice revealed the percentage by which rates would be adjusted, which HHS could reasonably have found to be an acceptable substitute to a dollar estimate of the state's aggregate expenditures. *See Evergreen*, 235 F.3d at 921 (permitting "the use of a percentage, rather than a dollar figure" in a state's notice of a proposed amendment).

Plaintiffs also do not contend that the June Notice was unavailable for public review – they just say it was not made available in the precise manner provided for in the regulation. But again, it is within the Secretary's discretion to consider publication in the *Pennsylvania Bulletin* the effective equivalent of distributing a notice to county offices. In any event, based on the record before it, HHS could readily conclude that Pennsylvania had "substantial[ly] compli[ed]" with federal notice requirements, which is all that is necessary for the Secretary to reasonably accept a state's assurances to that effect. *Indep. Acceptance Co.*, 204 F.3d at 1252 (holding that "in accepting the State's assurance, the Secretary was not required to hold the State to absolutely literal compliance with the notice requirements," but rather "had discretion to determine whether the State had given sufficient assurance that its notice was in substantial compliance"); *see also Oklahoma v. Shalala*, 42 F.3d 595, 603 (10th Cir. 1994) (deferring to CMS's decision to "relax[] the notice

49

requirement from full formal compliance to 'at least minimal compliance' through publication of 'an appropriate public notice before the effective date of the proposed change'").

We therefore agree with the District Court that HHS was neither arbitrary nor capricious in accepting DPW's assurance that the state had satisfied Section 13(A)'s public process requirements. That does not mean that Plaintiffs' dissatisfaction with the process at issue here is unreasonable. Their fundamental complaint – that DPW published an incomplete notice two days before the proposed effective date of a major change to the administration of its Medicaid program – is an accurate description of the state's actions. But HHS accepted those actions as being sufficiently compliant with federal law, and, particularly in light of the actual time the public had to consider the proposed change, we cannot say that the agency's conclusion was arbitrary or capricious on this record.

B.      *Supremacy Clause Claim Against the State Defendant*[27]

In addition to their claim against the Federal Defendants, Plaintiffs also seek declaratory and injunctive relief against the Secretary of DPW. The underlying substance of that claim is virtually identical to Plaintiffs' complaint against the Federal Defendants – they say that the rate revisions adopted by SPA 08-007 violate Section 30(A) and Section 13(A) of the Medicaid Act, and are thus preempted by federal law. Plaintiffs ask that we therefore enjoin the "continuing application" of the SPA (J.A. at 111), and that we require DPW to pay nursing facilities "using rates determined in accordance with the methods and standards

_____

[27] We note at the outset that it is questionable whether Plaintiffs can sustain a cause of action under the Supremacy Clause at all. In *Douglas v. Independent Living Center*, the Supreme Court granted *certiorari* "to decide whether Medicaid providers and recipients may maintain a cause of action under the Supremacy Clause to enforce a federal Medicaid law." 132 S. Ct. at 1207. The Court declined to answer that question, however, instead concluding that federal approval of the contested state plan put the case "in a different posture" and remanding the case to the court of appeals. *Id.* at 1210. Therefore, although the dissent strongly suggested that the Supremacy Clause does not provide a cause of action when Congress has declined to provide one, *id.* at 1211, the Court's previous decision in *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 n.14 (1983), which recognized a private right of action under the Supremacy Clause, remains binding on us. *Lewis v. Alexander*, 685 F.3d 325, 346 n.20 (3d Cir. 2012).

51

specified in the [state plan] in effect prior to changes contained in the vacated amendments" (J.A. at 140).

The District Court rejected Plaintiffs' claim for several reasons. First, invoking *Younger v. Harris*, 401 U.S. 37 (1971), it abstained from deciding the claim to the extent it challenged state conduct that occurred before federal approval of the SPA. The Court also denied all declaratory relief, concluding that such relief was barred by Eleventh Amendment sovereign immunity. That left only Plaintiffs' request for an injunction, which the Court allowed to proceed to discovery. The District Court subsequently entered summary judgment in favor of the State Defendant on that claim because of its conclusion "that the Federal Defendants' approval of the SPAs was not arbitrary or capricious under the APA." *Christ the King Manor*, 2012 WL 3027543, at *17. Although we have now decided that that conclusion was in error, we will nonetheless affirm the District Court's grant of summary judgment to the State Defendant on the basis that the Eleventh Amendment deprives us of jurisdiction to grant the requested relief.[28]

---

[28] "We exercise plenary review over a district court's grant of summary judgment," and we will affirm only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 867 (3d Cir. 2012) (internal quotation marks omitted). "Dismissal of an action based upon sovereign immunity is subject to plenary review by this Court." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 (3d Cir. 1996).

The Eleventh Amendment to the Constitution provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has made clear that, under that Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 (1890)). Therefore, unless Congress has "specifically abrogated" the states' sovereign immunity or a state has unequivocally consented to suit in federal court, we lack jurisdiction to grant relief in such cases. *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 (3d Cir. 1996); *id.* at 694 n. 2 ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction.").

Suits against state officials are a different matter, however. Based on its landmark holding in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court has permitted suits against state officials that seek prospective relief to end an ongoing violation of federal law. *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002). The theory behind *Young* is that a state officer lacks the authority to enforce an unconstitutional state enactment, and thus the officer is "stripped of his official or representative character and becomes subject to the consequences of his individual

53

conduct." *Id.* (quoting *MCI Telecomm. Corp v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001)) (internal quotation marks omitted). Plaintiffs can therefore bring suit against state officers, but their remedies are limited to those that are "designed to end a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Plaintiffs may not be awarded damages or other forms of retroactive relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984).

That bar on retroactive relief includes forms of equitable relief that are functionally equivalent to damage awards. *Green*, 474 U.S. at 69-70 (citing *Edelman*, 415 U.S. at 666-69). As we explained in *Blanciak v. Allegheny Ludlum Corp.*, "relief that essentially serves to compensate a party injured in the past by the action of a state official, even though styled as something else, is barred by the Eleventh Amendment." 77 F.3d at 697-98 (citing *Green*, 474 U.S. at 68; *Edelman*, 415 U.S. at 664-68). We contrasted such relief with remedies that may have "a substantial ancillary effect on the state treasury," but primarily serve "to bring an end to a present, continuing violation of federal law." *Id.* at 698 (quoting *Papasan v. Allain*, 478 U.S. 265, 278 (1986)) (internal quotation marks omitted). The label given to the requested relief is "of no importance" – we must "look to the substance rather than the form of the relief requested" to determine if it is barred by the Eleventh Amendment. *Id.* When an action "is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officers are nominal defendants." *Edelman*, 415 U.S. at 663 (quoting *Ford Motor Corp. v.*

54

*Dep't of Treasury*, 323 U.S. 459, 464 (1945)) (internal quotation marks omitted).

Under that standard, the remedies Plaintiffs seek against the State Defendant cannot properly be characterized as claims for prospective relief "designed to end a continuing violation of federal law." *Green*, 474 U.S. at 68. Plaintiffs challenge the Secretary of DPW's development and application of SPA 08-007, which, as already extensively discussed, used a BAF to adjust reimbursement rates for the 2008-09 fiscal year.[29] That SPA has not been in effect since July 1, 2009, and Plaintiffs do not claim that Pennsylvania's current rate-calculation methodology violates federal law. More to the point, they do not identify any ongoing conduct by the Secretary of DPW that must be enjoined to ensure the supremacy of federal law. Instead, they challenge the rates DPW paid five years ago, and they argue that they are entitled to "prospective corrective payments" from the state.

---

[29] The District Court construed Plaintiffs' claim more broadly, saying that it challenged not only SPA 08-007, but also "the underlying methodology" contained in the SPA – that is, the use of budget-based adjustments generally. That construction is too generous. Plaintiffs' complaint is quite specific in stating that it challenges SPA 08-007 and SPA 08-008 (which, as discussed *supra* note 8, is no longer at issue). Moreover, all of the factual allegations in the complaint focus on the state's adoption and implementation of SPA 08-007, and key to Plaintiffs' argument is that the BAF in that SPA was more damaging than in previous years. We therefore construe Plaintiffs' complaint as a challenge to the particular rates calculated using SPA 08-007, not as a generalized challenge to the use of a budget adjustment factor.

(Appellants' Opening Br. at 72.) Their overall case against the State Defendant therefore seems to be precisely the kind of suit that is barred by the Eleventh Amendment, as it seeks "to compensate a party injured in the past by the action of a state official," not to "bring an end to a present, continuing violation of federal law." *Blanciak*, 77 F.3d at 697-98.

A closer look at the requested remedy exposes the problem. Plaintiffs ask for an injunction that "requires" the Secretary of DPW "to assure" that the state "pays for nursing facility provider services" using the pre-SPA rates, and that "precludes" DPW "from any further reliance" on SPA 08-007. (J.A. at 113.) In other words, they ask that we require DPW to pay the 2008-09 rates in accordance with the previously approved state plan, which did not apply a BAF at all. Because SPA 08-007 is no longer in effect, that remedy will not help prevent future violations of federal law, and it is useful to Plaintiffs only if it "might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed." *Green*, 474 U.S. at 73. In fact, the record strongly suggests the Plaintiffs will do just that, as they have initiated state administrative proceedings requesting that DPW "recalculate" the 2008-09 rates "consistent with [the] law." (Administrative Appeal, Doc. 20, Ex. A, at 14.) The relief requested here would therefore "have much the same effect as a full-fledged award of damages or restitution by the federal court" – forms of relief that are clearly barred by the Eleventh Amendment.[30] *Green*, 474 U.S. at 73.

---

[30] The District Court reached a similar conclusion, holding that "insofar as [Plaintiffs] request … declaratory

Plaintiffs' arguments to the contrary are unavailing. They make no attempt to argue that there is an ongoing violation of federal law; rather, they contend that, notwithstanding the Eleventh Amendment, they are entitled to "complete retroactive relief" against the State Defendant. (Appellants' Opening Br. at 68.) First, they suggest that Pennsylvania consented to suit in federal court by participating in Medicaid. That argument clearly fails, as the Supreme Court has previously held that a state's participation in Medicaid is not "sufficient to waive the protection of the Eleventh Amendment." *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981).

---

relief that the State Defendant's implementation" of the SPA "violates federal law," that claim is barred by sovereign immunity under *Edelman* and *Green*. *Christ the King Manor, Inc. v. Sebelius*, No. 1:09-cv-2007, at 25 (M.D. Pa. June 29, 2010). The Court concluded that Plaintiffs had one viable request for prospective relief, however – their request for "injunctive relief preventing the State Defendant from basing its Medicaid reimbursement payments" on SPA 08-007. *Id.* But, as described above, that relief cannot be considered prospective, because Plaintiffs do not ask that we enjoin a continuing violation of federal law, but rather that we require DPW to pay nursing facilities using the state plan in effect prior to the challenged SPA. When, as in this case, there is no ongoing violation of federal law, the requested injunction is effectively a request for a declaration that the prior rate calculations were unlawful, and is thus barred by the Eleventh Amendment.

Plaintiffs' second contention is that their claim under the APA can somehow include relief against the State Defendant. They say that, when a plaintiff's Supremacy Clause claims "are inextricably intertwined" with an APA claim, "the APA claim must be deemed to provide for and permit the related resolution" of the Supremacy Clause claims. (Appellants' Opening Br. at 69.) But the only support Plaintiffs provide for that truly novel proposition is the Supreme Court's recent decision *Douglas v. Independent Living Center*, which held nothing of the sort. Indeed, *Douglas* strongly suggested that once an APA claim arises due to a SPA approval, a Supremacy Clause claim challenging the SPA is unsustainable, because allowing "a Supremacy Clause action to proceed once the agency has reached a decision threatens potential inconsistency or confusion." 132 S. Ct. at 1210. In any event, *Douglas* certainly did not hold that the presence of a cause of action against a federal agency under the APA abrogates a state's immunity from suit in federal court.

Finally, Plaintiffs say that "the State Defendant is an indispensable party" under Rule 19 of the Federal Rules of Civil Procedure. (Appellants' Opening Br. at 70.) Even if that were the case (and we express no opinion on the issue), being an indispensable party does not affect a state's sovereign immunity. Under the Eleventh Amendment, an unconsenting state cannot be sued in federal court by one of its citizens, regardless of whether the state is an essential party to the controversy.

Therefore, as Plaintiffs do not contend that there is an ongoing violation of federal law, we conclude that their claim against the State Defendant is barred by Eleventh

Amendment sovereign immunity. Accordingly, since we can affirm on any basis supported by the record, *Travelers Indem. Corp. v. Dammann & Co., Inc.*, 594 F.3d 238, 256 n.12 (3d Cir. 2010), we will affirm the District Court's grant of summary judgment to the State Defendant.[31]

## III.    Conclusion

In sum, we will affirm in part and reverse in part the District Court's orders. Because the State Defendant is immune from Plaintiffs' requested relief under the Eleventh Amendment, we will affirm the District Court's orders entering judgment in favor of that defendant. The District Court erred, however, in granting summary judgment to the Federal Defendants. By approving SPA 08-007 without any assurance that the amended plan would produce payments that are consistent with quality of care, the Secretary of HHS acted arbitrarily and capriciously, and the APA requires that we set that approval aside. Accordingly, we will reverse the District Court's grant of summary judgment to the Federal Defendants and will remand the case with instructions to enter a declaratory judgment in favor of Plaintiffs on their claim that HHS's approval of SPA 08-007 was arbitrary and capricious under the APA.

---

[31] Because we hold that the Eleventh Amendment bars all requested relief against the State Defendant, which deprives us of subject matter jurisdiction, we do not reach the question of whether the District Court properly abstained from resolving certain components of Plaintiffs' claim, nor do we consider whether their claim is moot.